*25 CV 6502 MAV*

# IN THE
# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NEW YORK

---

## RAMIRO LOACHAMIN JARAMILLO
*Petitioner,*

## - v. -

## ACTING DIRECTOR STEVE KURZDORFER, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF BUFFALO FIELD OFFICE OF U.S IMMIGRATION AND CUSTOMS ENFORCEMENT, ASSISTANT DIRECTOR JOSEPH FREDEN, IN HIS OFFICIAL CAPACITY AS OFFICIAL IN CHARGE OF BUFFALLO FEDERAL DETENTION FACILITY.
*Respondent.*

---

## VERIFIED PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241

---

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

Ramiro Loachamin
        Petitioner,
   v.

STEVE KURZDORFER, IN HIS OFFICIAL   PETITION FOR WRIT OF
CAPACITY AS DIRECTOR OF BUFFALO   HABEAS CORPUS PURSUANT
FIELD OFFICE OF U.S. ICE   TO 28 U.S.C. §2241
JOSEPH FREDEN, IN HIS OFFICIAL
CAPACITY AS OFFICIAL IN CHARGE
OF B.F.D.F.

                     Civ. No.:

        Respondents.

---

# INTRODUCTION

The Court must take into consideration that Respondent is a pro-se litigant untrained at law and lack the skills and expertise to properly draft his complaint to redress his injuries. Haines V. Kerner, 404 U.S. 519, 520 (1972), which holds, pro-se litigants are to be given leeway in the drafting of their motion's pleadings rather than to be stringiest standard required by trained counsel. In addition, the Courts had been advised to give leeway to layman litigants to allow for the development of potentially meritorious claim. Cruz v. Berto, 404 U.S. 319 (1972). Petitioner Ramiro Loachamin Jaramillo has been detained in the custody of the United States Department of Homeland Security ("DHS") since September 19, 2023- 23 months.

Petitioner, Ramiro Loachamin Jaramillo, entered the United States in 1981, he has been accorded the following immigration status: Lawful Permanent Resident, (Class IR-2)

Petitioner is currently being detained by the Department of Homeland Security ("DHS") pursuant to 8 U.S.C. § 1231(a)(6) because: (1) I have a final order of removal, and (2) because the ninety-day removal period has now elapsed. at the Buffalo Federal Detention Facility ("BFDF") in Batavia, New York. I have been in immigration detention for approximately 23 months. Petitioner was served with a Notice to Appear ("NTA") on September 19, 2023, charging him with removability based on my conviction(s) for Criminal Possession of Stolen Property 5th degree misd. in march 1995: Endangering The Welfare of a Child misd. in February, 2005: Attempted Criminal sale Controlled Substance 3rd degree Class C Felony in January 2017: Alien Smuggling And Transportation of Alien, Released February 16,2021 time served, and one year Supervised released. **(see attachment "A", NTA)**

## STATEMENT OF FACTS

Petitioner's claim is based on his Continued detention beyond the end of the removal period which is governed by the Supreme Court's decision in Zadvydas v. Davis, 533 U.S. 678, 121 S. Ct. 2491, 150 L. Ed. 2d 653 (2001). In Zadvydas, the Court held that section 1231(a)(6) implicitly limits an alien's detention to a period reasonably necessary to bring about that alien's removal from the United States, and does not permit " indefinite" detention. Id. at 701. Under Zadvydas, "[a]n alien is entitled to habeas relief after a presumptively reasonable six-month period of detention under § 1231(a)(6) only upon demonstration that the detention is 'indefinite' i.e., that there is 'good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future.' " Diouf v. Mukasey ("Diouf I"), 542 F.3d 1222, 1233 (9th Cir. 2008)(quoting Zadvydas, 533 U.S. at 701).

As such, Petitioner has been subject to mandatory immigration detention for approximately 24 months while my removal proceedings are pending. Without intervention from this Court, my detention will continue, as my immigration case is ongoing and timely undetermined. When a person has ongoing immigration proceedings, immigration detention without a bond hearing is considered unreasonably prolonged in violation of the Due Process Clause of the Fifth Amendment if such detention exceeds the removal period, the term used in the statute to describe the 90-day, six months period following an order of removal.

DHS has not yet conducted a bond hearing to determine whether my continued detention is justified. My immigration detention is unreasonably prolonged because I have been detained for more than 23 months without a bond hearing, and my detention will continue unless this Court grants me relief. Once it is established that immigration detention is unreasonably prolonged, the burden shifts to the government to prove by clear and convincing evidence that my continued detention is warranted either because Petitioner is considered a danger to the community or Petitioner pose a flight risk.

Petitioner respectfully request that this Court issue a writ of habeas corpus and order the Respondent to release me from their custody because the Respondent cannot establish by clear and convincing evidence that my continued detention is warranted, and continuing to detain Petitioner violates my constitutional due process rights under the Fifth Amendment. In the alternative, Petitioner respectfully request this Court order a bond hearing where the Respondent bears the burden to prove by clear and convincing evidence that my continued detention is necessary to prevent flight or danger to the community.

3

Petitioner was released from federal custody on February 16, of 2021, placed on supervised release. After two years and seven months on supervision, Immigration serves petitioner with a NTA September 23, 2023, during those two years and seven months, Petitioner was home reporting to Probation every month, maintaining a job, supporting his family. Petitioner has demonstrated to Federal District Court while on Pre-Sentencing Probation that, petitioner is not a danger to the community or a flight risk. Petitioner lived peaceably in the community. In the two years and seven months on Probation since my release, petitioner has not been arrested, let alone convicted of any crime, Nor violated Federal Probation. Petitioner worked to support his family financially. Petitioner's parents, wife, kids , and sisters and brother are all U.S Citizens or Permanent Residents lawfully in the United States, the place I have called home since 1981, at the age of nine.

Accordingly, Petitioner respectfully request that the Court use its authority under 28 U.S.C. § 2243 to order the Respondent to file an answer and return within three days, unless they can show good cause for additional time. See 28 U.S.C. § 2243 (stating that an order to show cause why a petition for a writ of habeas corpus should be denied "shall be returned within three days unless for good cause additional time, not exceeding twenty days, is allowed"). In order to permit full judicial review of the claims herein and requested relief, Petitioner also respectfully request that the Court order the Respondent not to transfer me outside the jurisdiction of this Court pending consideration of this Petition.

In Zadvydas v. Davis, 533 U.S. 678 (2001), the Supreme Court held that six months is the presumptively reasonable period during which ICE may detain aliens in order to effectuate their removal, id. at 702.

4

Interim administrative regulations also recognize that the HQPDU has a six-month period for determining where there is a significant likelihood of an alien's removal in the reasonable foreseeable future, 8 C.F.R. §241.13(b)(2)(ii).

Petitioner's order of removal became final on September 24,2024. Petitioner has been in ICE custody since September 21, 2023. Therefore, the presumptively reasonable removal period of six months for Petitioner ended on March 24, 2025.

Petitioner, Ramiro Loachamin, hereby petitions this Court for a writ of habeas corpus to remedy his unlawful detention, and to enjoin his continued unlawful detention by the Respondents. In support of this petition and complaint for injunctive relief, Petitioner alleges as follows:

## PARTIES

Petitioner, Ramiro Loachamin Jaramillo is detained at Buffalo Federal Detention Facility. Respondent  Acting Director Steve Kurzdorfer is sued in his official capacity as the Field Director of Buffalo U.S Immigration and Customs Enforcement, as well as Assistant Director Joseph Freden in his official capacity as the Assistant Director of Buffalo ICE field office and Officer-in-Charge of the Buffalo Federal Detention Facility, at which Petitioner is currently detained.

## JURISDICTION AND VENUE

This action arises under the Constitution of the United States, and the Immigration and Nationality Act (INA), 8 U.S.C. §1101 et seq., as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 1570, and the Administrative Procedure Act (APA), 5 U.S.C. § 701 et seq. This Court has jurisdiction under 28 U.S.C. § 2241,

Art. I § 9, Cl. 2 of the United States Constitution (Suspension Clause), and 28 U.S.C. § 1331, as the petitioner is presently in custody under color of the authority of the United States, and such custody is in violation of the Constitution, laws, or treaties of the United States. See Zadvydas v. Davis, 533 U.S. 678, 121 S. Ct. 2491 (2001); *Demore v. Kim, 538 U.S. 510, 516-17 (2003)* .

Furthermore, while 8 U.S.C. § 1226(e) bars judicial review of the discretionary denial of bond, it does not bar constitutional challenges to the bond hearing process. See, e.g., *Medley v. Decker, No. 18-CV-7361 (AJN), 2019 WL 7374408, at \*3 (S.D.N.Y. Dec. 11, 2019),* (federal district courts have habeas jurisdiction to hear challenges to constitutional adequacy of bond hearing procedures); see also *Singh v. Holder, 638 F.3d 1196, 1202 (9th Cir. 2011)* ("Claims that the bond process itself was constitutionally flawed are 'cognizable in federal court on habeas . . . .'") (quoting *Gutierrez–Chavez v. INS, 298 F.3d 824, 829 (9th Cir.2002)).*

Venue is proper in the U.S. District Court for the Western District of New York under 28 U.S.C. § 1391 because the Defendant is in this District; I am currently being detained within this District at the Buffalo Federal Detention Facility in Batavia, New York; and a substantial part of the events giving rise to the claims in this action took place in this District.

## STANDARD
## WRIT OF HABEAS CORPUS

Congress has also authorized federal district courts "to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or laws or treaties{2020 U.S. Dist. LEXIS 14} of the United States,'" *Wang v. Ashcroft,*

*320 F.3d 130, 140 (2d Cir. 2003)* (quoting 28 U.S.C. § 2241(c)(3)), including claims by non-citizens challenging their detention without bail. *Demore v. Kim, 538 U.S. 510, 516-17, 123 S. Ct. 1708, 155 L. Ed. 2d 724 (2003). Carol William Black v. Thomas Decker, No.20-3224 (2024)*

## EXHAUSTION OF REMEDIES
## DHS's 90 DAY AND 180 DAY CUSTODY REVIEW TO PETITIONER

There is no statutory exhaustion requirement for a petition challenging immigration detention. See Araujo-Cortes v. Shanahan, 35 F. Supp. 3d 533, 538 (S.D.N.Y. 2014). Petitioner is not required to exhaust administrative avenues to challenge my detention because the statutory authority that permits my detention provides no administrative vehicle for doing so. See 8 U.S.C. § 1231(a)(6); see also Cave v. East Meadow Union Free Sch. Dist., 514 F.3d 240, 249 (2d Cir. 2008) ("The exhaustion requirement is excused when exhaustion would be futile because the administrative procedures do not provide an adequate remedy.").

Nonetheless, Petitioner has exhausted his administrative remedies to the extent required by law, and his only remedy is by way of this judicial action. After the Supreme Court decision in Zadvydas, the Department of Justice issued regulations governing the custody of aliens ordered removed. See 8 C.F.R. §241.4.

On September 21, 2023 Petitioner was taken into custody . DHS on 11/12/2024 served a Petitioner with a  90 day "Notice to Alien of File Custody Review, ICE Field Director will review your case for consideration of release on an Order of Supervision, Pursuant to 8 CFR 241. Release, however is dependent

on your demonstrating by " Clear and Convincing Evidence" that you **will not** Pose a Danger to the Community and **will not** be Significant Flight Risk".

DHS on 12/26/2024 Determined that Petitioner will remain in Ice custody due to the only given reason "ICE has reason to believe there's a significant likelihood that your removed in the Reasonable Foreseeable Future". **see attachment "B" (A copy of that decision is attached.)**

Beginning of April DHS served Petitioner with 180 day Custody Review by the Department of Homeland Security Headquarters Post-Order Detention Unit ("HQPDU") in Washington, D.C. The purpose of this 180 day Custody Review "Notice to Alien of File Custody Review, "HQPDU" will review your case for consideration of release on an Order of Supervision, Pursuant to 8 CFR 241. Release, however is dependent on your demonstrating by " Clear and Convincing Evidence" that you **will not** Pose a Danger to the Community and **will not** be Significant Flight Risk"  at Interview with DO Petitioner submitted documents to be reviewed in support of Petitioner's consideration of release on an order of supervision pursuant to 8 CFR 241.

On 4/14/2025 DHS served Petitioner with a "Decision to Continue Detention" the letter stated that "ICE has reviewed Petitioner's custody status and determined that Petitioner will not be released from custody at this time". (*A copy of that decision is attached.*) this letter stated that Petitioner's continued detention only reason was due to "having  been previously removed from the U.S. Subsequent to a removal order issued by an Immigration Official". Petitioner on the same day 4/14/2025 informed Deportation Officer (DO) that Decision to Continue Detention letter was wrong, Petitioner claimed to DO, that Petitioner had never Previously been removed from the U.S. By a Immigration Official, And if

that was one of the reasons to continue detention , DHS was wrong on Determination letter. DO on 4/22/2025 came back with a correction letter from previous letter "Decision to Continue Detention" stating that "Due to petitioner's pending case in the Second Circuit, ICE is unable to move forward with petitioner's removal from the U.S. at this time. Pending a ruling on case, ICE has reason to believe there's a significant likelihood that your removal will occur in the reasonable foreseeable future"**(attachment "B" also attached (documents in support of 180 day Custody Review)**

DHS has not determined or claimed that the Petitioner is by " Clear and Convincing Evidence" that petitioner **will** Pose a Danger to the Community and **will** be Significant Flight Risk". Preventive detention based upon dangerousness has traditionally been limited to especially dangerous individuals and requires "strong procedural protections", as it presents serious constitutional concerns the longer detention lasts. In the Zadvydas and Salerno, the Government failed to prove by clear and convincing evidence that an arrestee presented an identified and articulated threat to an individual or the community." Here, DHS categorically failed to meet the clear and convincing standard. To prove a fact by clear and convincing evidence, a party must submit evidence to "demonstrate that a factual contention is 'highly probable'. Under this standard, DHS is required to prove that it was highly probable that, if released, Petitioner would engage in violence. "The mere conviction of a crime is not an adequate basis for findings that an individual is a threat to the community." In the Korkees and Patriarca cases the Judges found that: although in theory a Mafia Boss was an intimidating and highly dangerous character, the government had not demonstrated that this Boss posed a significant danger, or at least a danger that could not be overcome given appropriate

9

conditions. Past crimes are not basis for determining that the Petitioner is a present danger. In the D'Alessando v. Mukasey, case the government was criticized where "DHS has simply taken petitioner's decades-old criminal conviction and concluded that the petitioner is a present danger to society." Release under supervision is warranted when the Petitioner is in no way a "flight risk and threat to the community".

The purpose behind detaining criminal aliens is to ensure their appearance at removal proceedings and to prevent them from engaging in further criminal activity. Here Petitioner served his Parole term of one year with no violations in 2017; Petitioner was released from federal custody on February 16, of 2021, on Pre-Sentencing probation. After two years and seven months on probation, during those two years and seven months, Petitioner was home reporting to Probation every month, maintaining a job, supporting his family. Petitioner has demonstrated to Federal Court while on Pre-Sentencing Probation that, petitioner is not a danger to the community or a flight risk. Petitioner lived peaceably in the community. In the two years and seven months on Pre-Sentencing Probation since his release, petitioner has not been arrested, let alone convicted of any crime, Nor violated Probation. Petitioner worked to support his family financially.
(*See* **Attachment "C", N.Y.S. Parole and Federal probation termination letters).**

But Petitioner has not been given the opportunity to challenge his detention at a hearing. Now that Petitioner's detention has become unreasonably prolonged, due process requires some opportunity to be heard "at a meaningful time and in a meaningful manner," Armstrong, 380 U.S. at 552, to challenge the statute's assumptions as applied to him. An opportunity to be heard in a meaningful manner

necessarily requires a hearing that "satisfies the constitutional minimum of fundamental fairness." Santosky v. Kramer, 455 U.S. 745, 756 n.8, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (citation and internal quotation marks omitted).

When the government seeks the civil detention of a person to effect a compelling regulatory purpose, it must show by clear and convincing evidence that such detention is necessary to serve that compelling interest. See Foucha v. Louisiana, 504 U.S. 71, 81-83, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992); Addington, 441 U.S. at 432-33; see also Santosky, 455 U.S. at 756 (explaining that the "clear and convincing evidence" standard applies "when the individual interests at stake in a . . . proceeding are both 'particularly important' and 'more substantial than mere loss of money'" (quoting Addington, 441 U.S. at 424)). That standard applies equally here. To sustain the prolonged detention of a noncitizen subject to removal proceedings based on its general interests in immigration detention, the "government is required, in a 'full-blown adversary hearing,' to convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person," Foucha, 504 U.S. at 81 (quoting Salerno, 481 U.S. at 751), or ensure that the noncitizen will appear for any future proceeding. This requires consideration of less restrictive alternatives to detention. See id.; cf. United States v. Playboy Ent. Grp., Inc., 529 U.S. 803, 816, 120 S. Ct. 1878, 146 L. Ed. 2d 865 (2000) ("When a plausible, less restrictive alternative is offered to a" regulation burdening a constitutional right, "it is the [g]overnment's obligation to prove that the alternative will be ineffective to achieve its goals.").

While the length of his detention is in part due to his pursuit of relief, it is also due to the waiting process, which the Petitioner has been subjected to. Accordingly,

he is entitled to be release on reasonable conditions of supervision or alternative to detention adequate. All persons, including aliens, residing in the United States are protected by the Due Process Clause of the Fifth Amendment of the United States Constitution. The Due Process Clause of the Fifth Amendment provides that "no person shall be deprived of life, liberty, or property, without due process of law. The United States Constitutional Amendment Freedom from imprisonment from government custody, detention, or other form of physical restraint lies at the heart of the liberty that Clause protects." This protection extends also to an alien subject to final order of removal. Detention by Immigration and Customs Enforcement puts at risk individual protected liberty interest. The substantive Due Process requirement of the Fifth Amendment prohibits the government from subjecting persons to preventative detention for a potentially indefinite period of time.

Civil detention must be narrowly drawn to serve a legitimate and compelling government interest, such as ensuring that detainees if released will not present a danger to community or abscond from future immigration proceedings. An alien's mere status as "removable", which bears no relationship to his dangerousness, is not a sufficient basis to justify indefinite detention. Petitioner continued prolonged detention violates his right to substantive due process by depriving him of his core liberty interest to be free from bodily restraint. The Petitioner ongoing detention violates the Eighth Amendment. The Government's categorical denial of bail to certain non-citizens violates the right to bail encompassed by the Eight Amendment.

## LEGAL ARGUMENT PROCEDURAL DUE PROCESS REQUIRES THAT I BE RELEASED OR, AT MINIMUM, AFFORDED A CONSTITUTIONALLY ADEQUATE BOND HEARING AT WHICH THE GOVERNMENT MUST JUSTIFY MY CONTINUED DETENTION

The U.S. Supreme Court's opinion in Zadvydas v. Davis stands for the proposition that "freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." 533 U.S. at 690 (citing Foucha v. Louisiana, 504 U.S. 71, 80 (1992)).

The Fifth Amendment's Due Process Clause forbids the federal government from depriving any "person of liberty without due process of law." U.S. CONST. amend. V. Prolonged detention requires due process protections for individuals, even those whose "presence in this country is unlawful." Plyler v. Doe, 457 U.S. 202, 210 (1982). Thus, as the Court noted, "a statute permitting indefinite detention of a noncitizen would raise a serious constitutional problem." Zadvydas, 533 at 690.  By subjecting non-citizens like myself to mandatory immigration detention, thus raising the very serious constitutional problem that the Court had cautioned against in Zadvydas.

Although the Supreme Court ruled in Demore that mandatory detention pending removal proceedings is not unconstitutional per se, the Court left open the question of whether the duration of such mandatory detention is subject to constitutional constraints. Such constitutional constraints can be found in the Fifth

Amendment of the U.S. Constitution, which, as the Court recognized in Demore, "entitles noncitizens to due process of law in deportation proceedings." *538 U.S. at 523 (quoting Reno v. Flores, 507 U.S. 292, 306 (1993)).*

## § 1226. APPREHENSION AND DETENTION OF ALIENS

Section 236(c) of the Immigration and Nationality Act, as amended, provides that "the attorney General shall take into custody any alien who" is removable from this country because he has been convicted of one of a specified set of crimes. The statute requires the Department of Homeland Security to take into custody any alien who "is deportable" from the United States based on having been convicted of any of a wide range of crimes. It is respectfully submitted that INA §236(c), INA § 241 and other mandatory detention statutes are deemed unconstitutional by a majority of courts. See Hoang v. Comfort, 282 F. 3d 1247 (10th Cir. 2002); Patel v. Zemski, 275 F. 3d 299 (3d Cir. 2001).

Petitioner believes his detention was unreasonably delayed  because the government failed to recognize the "when...release" clause, by not detaining Petitioner(an alien) subject to mandatory detention immediately after my release from non-DHS custody. DHS has already deprived the public of the benefits of mandatory detention and proved that I am not a danger to the community or flight risk. Petitioner was allowed to walk free for almost three years,while out on pre-sentencing probation from 2021, I was approached by ADA Stitt, and DHSI agent named Trevor Kinblom and his Supervisor from the northern district of NY to be a confidential informant for them on a investigation that lasted almost 3 years while I was on Federal Probation,  therefore I should not be consider a danger, nor a threat to the community.**(see attachment "D"ADA STITT AND PD GABRIELE)**

14

When Congress believes that "aliens presents such a presumptive risk of danger or flight that they should be immediately confined upon their release from non-DHS custody". Moreover, once petitioner left non-DHS custody, the need for a presumption of danger or risk of flight was reduced or became nonexistent. *Khoury, 3 F. Supp. 3d at 888*. Like Section 236(c) of Immigration and Nationality Act, however the TPCR required that this smaller subset of criminal non-citizens be taken into INS custody when......released" from criminal custody. *IIRIRA § 303(b)(3)(A)* (text in historical notes following 8 U.S.C. § 1226 (Supp. 1998)). Congressional intent also supports the "when . . . released" clause's plain meaning. First, Congress enacted Section 236(c) out of two primary concerns: that non-citizens convicted of specific crimes might (1) commit additional crimes, and thus pose a danger to their community, and (2) avoid appearing at their immigration proceedings to evade deportation, and thus pose a flight risk. *See Demore, 538 U.S. at 518-22, 531*. To address these concerns,{2015 U.S. Dist. LEXIS 29} Congress targeted a specific subset of non-citizens whom it predicted would be dangerous and elusive. And it sought to create a pipeline for their transfer "directly from jailhouse to immigration detention" to ensure that they would not return to the community. *Castaneda II, 952 F. Supp. 2d at 316; Khoury, 3 F. Supp. 3d at 888*. Under this detention scheme, there is an irrebuttable presumption that this specific subset of non-citizens (who have committed an enumerated offense and been detained "when . . . released" from criminal custody) are categorically dangerous and a flight risk. As a result, their detention is mandatory. For all other non-citizens in removal proceedings, however, the presumption is rebuttable - and individual bond hearings allow them their opportunity to make their case. In so drafting the statute, Congress struck a balance. Recognizing the constitutional issues at play,

it prioritized a narrow subset of individuals whose Due Process rights could permissibly be encroached upon. "The evidence Congress had before it certainly supports the approach it selected . . . ." *Demore, 538 U.S. at 528.*

    The Plain Meaning of "When" The Court's analysis begins with the text of the statute. The Oxford English Dictionary's first definition of "when" (in its non-interrogative use) is "at the (or a) time at which; on the (or an) occasion on which." The Oxford English Dictionary,  (last visited January 14, 2015). Supplementing its definition, the dictionary provides: "in reference to a definite actual occurrence or fact, chiefly with verb in past tense: At the time that, on the occasion that. . . ." Id. (emphasis supplied). "'When' includes the characteristic of 'immediacy,' referring in its primary conjunctive sense, to action or activity occurring 'at the time that' or 'as soon as' other action has ceased or begun." *Waffi v. Loiselle, 527 F. Supp. 2d 480, 488 (E.D. Va. 2007)* (citing 20 The Oxford English Dictionary 209 (2d ed. 1989); The American Heritage Dictionary {2015 U.S. Dist. LEXIS 17} of the English Language (4th ed. 2000)), abrogated by *Hosh, 680 F.3d 375. See also Martinez-Done, 2014 U.S. Dist. LEXIS 143453, 2014 WL 5032438, at *7* ("In everyday English, 'when' clearly 'connote[s] immediacy.'") (alteration in original) *(citing Straker, 986 F. Supp. 2d at 354); Castaneda I, 769 F.3d at 44* (noting that "when" means "as soon *{84 F. Supp. 3d 259}* as," as in, "I'll call you when I get there") (citing American Heritage Dictionary 2032 (3d ed. 1992)).

    When non-citizens such as Petitioner, was apprehended almost three years after my release from criminal custody in February 2021 , rather than "when" I was released, however, Congress's{2015 U.S. Dist. LEXIS 30} presumptions

become rebuttable, In the time since Petitioner's release, "I either demonstrated myself to be a danger to the community or I have not. In other words, given either myself or the government the fodder for a bond hearing." *Khoury, 3 F. Supp. 3d at 888.*

Further, any "presumption of dangerousness and flight risk is eroded by the years I lived peaceably in the community." *Castaneda I, 769 F.3d at 43. See Saysana, 590 F.3d at 17-18* ("It stands to reason that the more remote in time a conviction becomes and the more time after a conviction an individual spends in a community, the lower his bail risk is likely to be."). *{84 F. Supp. 3d 264} See also infra n.11 (citing Khoury, 3 F. Supp. 3d at 888). See also Lora v. Shanahan, 804 F.3d 601 (2d Cir. 2015)*Accordingly, due process requires "adequate procedural protections" and a "special justification" for physical detention that "outweigh the 'individual's constitutionally protected interest in avoiding physical restraint.'" *Zadvydas, 533 U.S. at 690-91 (Hendricks, 521 U.S. at 356).* Congress provided that special justification and narrowed the class of individuals subject to it by applying Section 236(c) to a limited number of individuals who are transferred from criminal custody into DHS custody at or around the time they are released. That special justification, however, no longer applies for non-citizens such as I, Ramiro Loachamin Jaramillo who have, by virtue of being in his community for two years and eight months, rebutted Congress's otherwise acceptable presumption of dangerousness, recidivism, and flight risk. Holding Petitioner without a bond hearing now raises constitutional concerns that would not have been present had I been apprehended "when . . . released." In his concurrence in *Demore v. Kim,* Justice Kennedy recognized that a statute may serve its purpose{2015 U.S. Dist. LEXIS 35} generally but still fail to justify the detention of a specific individual: particularly, "were there to be an unreasonable delay by the INS in pursuing and

completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *538 U.S. at 532-33 (Kennedy, J., concurring).*

I was released from federal custody on February 16, of 2021, on Pre-Sentencing probation .while out on pre-sentencing probation from 2021 I was approached by DHSI agent named Trevor Kinblom and his Supervisor from the northern district of NY to be a confidential informant for them on a investigation that lasted almost 3 years while I was on Federal Probation, (**see attachment"D" ADA STITT AND PD GABRIELE, cooperation letters**)

After two years and eight months on probation, Immigration serves petitioner with a NTA September 23, 2023, during those two years and seven months, Petitioner was home reporting to Probation every month, maintaining a job, supporting his family. Petitioner has demonstrated to Federal Court while on Pre-Sentencing Probation that, petitioner is not a danger to the community or a flight risk. Petitioner lived peaceably in the community.  In the two years and seven months on Pre-Sentencing Probation since his release, Petitioner has not been arrested, let alone convicted of any crime, Nor violated Probation. Petitioner worked to support his family financially. Petitioner's parents, wife, kids , and sisters and brother are all U.S. Citizens or Permanent Residents lawfully in the United States, the place petitioner has called home since the age of nine.

## BECAUSE MY DETENTION HAS BEEN UNREASONABLY PROLONGED AND I AM BEING DEPRIVED OF A LIBERTY INTEREST, DUE PROCESS DEMANDS MY RELEASE OR, AT MINIMUM, THAT I RECEIVE A CONSTITUTIONALLY ADEQUATE BOND HEARING.

In the wake of Jennings, the Western District of New York ("WDNY") has developed a two-step inquiry for evaluating procedural due process challenges to prolonged immigration detention. Hemans v. Searls, No. 18-CV-1154, 2019 WL 955353, at *5 (W.D.N.Y. Feb. 27, 2019).

Considering the factors outlined in Mathews, In the first step of the inquiry, the Court considers whether the detention has been unreasonably prolonged by weighing several distinct factors. Id. If the Court finds that the detention was unreasonably prolonged, it proceeds to step two of the inquiry, which involves identifying what process is due by considering the factors outlined in Mathews v. Eldridge, 424 U.S. 319, 335 (1976); Hemans, 2019 WL 955353, at *5.; see also Hechavarria v. Sessions, No.15-CV-1058 (LJV), 2018 WL 5776421, at *7-9 (W.D.N.Y. Nov. 2, 2018), Carol William Black v. Thomas Decker, No.20-3224 (2024); Ricardo Rodriguez v. Merrick Garland No. EDCV 23-0216-JPR, (2024). If the government has failed to provide the detained person with the procedural safeguards dictated by the Mathews factors, then the detained person's continued detention violates procedural due process. Hechavarria, 2018 WL 5776421 at * 8-9.

19

I have been detained since September 21,2023, and have been detained for over 23 months. Since the length of my detention exceeds six months, the first factor weighs in my favor when determining whether my detention has become unreasonably prolonged.

The second factor considered is the question of which party is responsible for the detention being unreasonably prolonged. *Cabral, 331 F. Supp. 3d at 261.* While a detained person who is found to be "abusing the processes provided to him" would bear the responsibility of their detention being prolonged, a detained person who "simply made use of the statutorily permitted appeals process" cannot be made responsible for his prolonged detention. *Hechavarria v. Sessions, 891 F. 3d 49, 56 n.6 (W.D.N.Y. 2018); see also Hechavarria, 2018 WL 5776421 at *7*

An immigration judge ordered me deported on April 11, 2024. After being denied relief, I appealed my case to the Board of Immigration Appeals ("BIA") in May 10th, 2024  and my BIA was also denied in September 24th, 2024, and  then filed a petition for review (PFR) of the BIA's order with the United States Court of Appeals for the second Circuit and a "Stay of Removal" that appeal remains pending  which will know is timely undetermined. Hence, Factor two weighs in my favor as I have made use of the "statutorily permitted appeals process". Id

Factor three weighs in my favor since I have asserted the following defense(s) to my removal:  Convention Against Torture"C.A.T"; withholding of Removal and Derivative Citizenship From Naturalize father.

Factor four weighs in my favor because the length of my immigration detention  exceeds 16 months, the amount of time I spent in prison for the conviction(s) that made me removable.

Factor five weighs in my favor because my detention at the BFDF is not meaningfully different from detention at a penal institution because it comprises many of the same restrictions that often accompany penal detention and incarceration, including restrictions on movement and expectations to follow orders of presiding facility officers. *See Ranchinskiy, 422 F. Supp. 3d at 799* (finding, absent rebuttal from the government, that detention at the BFDF is akin to criminal incarceration); *Barrington Walker, Petitioner, v. Jeffrey Searls 23-CV-140-LJV; Gonzales Garcia v. Barr, No. 6:19-CV-6327-EAW, 2020 WL 525377, at \*15 (W.D.N.Y. Feb. 3, 2020)* enforcement denied on other grounds sub nom. Gonzales *Garcia v. Rosen, 513 F. Supp. 3d 329 (W.D.N.Y. 2021)*

We are being subjected to a strict locked down in a 2 man cell for 16 hours out of 24 hours every day and we are only allow 6 hours out while more than an hour out of that 6 hours is for meal time which can not be count as a meaningful recreation time.*see Barrington Walker, Petitioner, v. Jeffrey Searls 23-CV-140-LJV* April 23, 2024. This was type of lockdown was only applicable during the COVID period and it is still being enforced till now February, 2025, even now that COVID is over with. "Six of the dorm units are open-dorm style," but three others-for detainees with criminal histories detainees-have cell doors that close in lock down every two and half hours taking turn everyday with the second floor detainees, And "persons held at BFDF [are] required to wear . . . restraints . . . when being booked in or booked out" or when they are "facing discipline [and are] brought to the Special Housing Unit" ("SHU"). Because of the cells, restraints, and discipline in the SHU, conditions at BFDF certainly "resemble penal confinement" Sajous, 2018 U.S. Dist. LEXIS 86921, 2018 WL 2357266, at \*11 (citations omitted); *Barrington Walker, Petitioner, v. Jeffrey Searls 23-CV-140-LJV April 23, 2024* , for at least some persons detained there. *Muse, 409 F. Supp. 3d at 717*

21

("The reality is that the BFDF houses noncitizens against their will with various restrictions on their freedom of movement. Thus, while perhaps not akin to a maximum-security prison . . . the facility does not seem meaningfully different from at least a medium Low-security penal institution for criminal detention."). *Sajous, 2018 U.S. Dist. LEXIS 86921, 2018 WL 2357266, at \*11; Barrington Walker, Petitioner, v. Jeffrey Searls 23-CV-140-LJV April 23, 2024*. Courts consider the conditions of detention. Whether "the facility for the civil immigration detention is meaningfully different from a penal institution for criminal detention" factors into the reasonableness of petitioner's detention. *Sajous, 2018 U.S. Dist. LEXIS 86921, 2018 WL 2357266, at \*11.*
"The more that the conditions under which the noncitizen is being held resemble penal confinement, the stronger his argument that he is entitled to a bond hearing." *Muse, 409 F. Supp. 3d at 717; Barrington Walker, Petitioner, v. Jeffrey Searls 23-CV-140-LJV April 23, 2024*

Factor six weighs in my favor I was convicted of Alien Smuggling And Transportation of Alien a deportable offense. I was sentence to time served of 15 months, and I been in immigration detention for about 17 months is like serving time for the same conviction.

Factor seven weighs in my favor because my case is ongoing. Petitioner's continued detention is invalid because there is "good reason to believe that there is no significant likelihood of [his] removal in the reasonably foreseeable future." *Zadvydas v. Davis, 533 U.S. 678, 701, 121 S. Ct. 2491, 150 L. Ed. 2d 653 (2001).* Petitioner's PFR and stay are still pending in the Second Circuit Courts, there is still an Appeal process stage we have not yet proceeded to the briefing stage which takes 90 day to file a brief, and six months to a year for Courts to process

petition. Petitioner has asserted defenses to removal, seeking to terminate his removal order and to be granted an opportunity to pursue Convention Against Torture"C.A.T"; withholding of Removal and Derivative Citizenship From Naturalize father. "The Government need not inquire into the strength of these defenses-it is sufficient to note their existence and the resulting possibility that Petitioner will ultimately not be removed, which diminishes the ultimate purpose of detaining petitioner." Sajous, 2018 U.S. Dist. LEXIS 86921, 2018 WL 2357266, at *11.

Pursuant to United States v. Zadvydas, the Magistrate Judge determined that Salad has shown "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future" because the fact that Salad is prima facie eligible for TPS status means he is currently not removable. even if his TPS application is denied, he will remain unremovable until the completion of the appeal process. (*see*. Salad v. Dep't of Corr., 769 F. Supp. 3d 913, 2025 U.S. Dist. LEXIS 41117, 2025 LX 115113, 2025 WL 732305 (Dist. Alaska March 7, 2025)

Petitioner's detention is not near its conclusion. Although ICE says that it will promptly remove petitioner if the Circuit denies his appeal, the Circuit is holding Petitioner's PFR in pending with a filed Stay of Removal, if the Circuit grants his PFR, it will likely remand the case to the immigration court for additional withholding-only proceedings, which Petitioner could then appeal administratively and again to the Circuit. See Velars Lopez, 978 F.3d at 852. Petitioner has every incentive to continue to pursue his available defenses to deportation in order to remain in the United States, where he has lived for more than forty years. Rosario v. Decker, No. 21 Iv. 4815, 2021 U.S. Dist. LEXIS 135038, 2021 WL 3115749, at *3 (S.D.N.Y. July 20, 2021)

23

Petitioner asserts that, he is being detained illegally as he will not be removed in the reasonably foreseeable future, Petitioner has been detained in ICE custody since September 21,2023, where he has been detained since that time while he continues to pursue relief in immigration court. Thus, he has been held in civil detention for nearly 24 months, and during that time he has not had a bond hearing. The Zadvydas v. Davis, 533 U.S. 678, 121 S. Ct. 2491, 150 L. Ed. 2d 653 (2001) Court stated that "after this six month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the government must respond with evidence to rebut that showing". The Court further noted that for the detention to remain reasonable, as the period of prior post removal confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink.

The United States Court for the Western District of New York - Buffalo and Rochester Division both recently granted multiple procedural due process challenges brought by Detainees who had been in immigration detention approximately thirteen months. "Gutierrez v. Barr, NO. 20-CV-6199-FPG, 2020 U.S. Dist. LEXIS 109917" finding that this length of time was "beyond the point at which courts find detention unreasonably prolonged". See also "Ramos v. Barr, No. 20-CV-371-FPG, 2020 U.S. Dist. LEXIS 126905". See also Gutierrez v. Barr, No. 20-CV-6078-FPG, 2020 U.S. Dist. LEXIS 74895,2020 WL 20598456, at *2 (W.D.N.Y. Apr.29,2020). (see. attachment"E", Western District of New York recently granted multiple procedural due process challenges)

Finally, the court held that not every alien must be released after six months, and that an alien may be confined until it has been determined that there is no

significant likelihood of removal in the reasonably foreseeable future. In Ly v. Hansen, 351 F.3d 263 (6th Cir. 2004), the Sixth Circuit Court held that removable aliens may de detained for a time reasonably required to complete removal proceedings, the detainee may seek relief in Habeas Proceedings; Habtegaber v. Jenifer, 256 F. Supp. 2d 692, 696 (E.D. Mich. 2003).

The post-order custody of deportable aliens such as Petitioner is reviewed under the procedures set forth at 8 C.F.R. § 24.4 and 241.13. The court notes that § 241.13 establishes procedures to determine whether there is a significant likelihood that an alien will be removed from the United States in the foreseeable future. In Zadvydas v. Davis, 533 U.S. 678, 121 S. Ct. 2491, 150 L. Ed. 2d 653 (2001), the Supreme Court rejected as unconstitutional the government's argument that the Attorney General has discretion to detain indefinitely an alien subject to a final order of removal. The Court stated "The serious constitutional problem arising out of a statue that, in these circumstances, permits an indefinite, perhaps permanent, deprivation of human liberty without any [procedural] protection is obvious". To save the statute from unconstitutionality, the Supreme Court read into it a "reasonableness" requirement. The Supreme Court instead read a temporal limitation into the statute, holding that, although detention beyond the 90-day removal period was permitted by statute, "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute". Thus, an immigrant's continued detention violates the Constitution "if removal is not reasonably foreseeable". In such circumstances, the district court should hold continued detention unreasonable and no longer authorized by statute". Going by the constitution of the United States, the Supreme Court's ruling in Zadvydas and other precedents like D'Alessandro v. Mukasey, 628 F. Supp. 2d 368, 385

(W.D.N.Y. 2009), Petitioner alleges that the government is illegally detaining him beyond the presumptive six months period. Petitioner's removal is not reasonably foreseeable. Petitioner is still at the beginning of a BIA appeal legal challenge. Respondents therefore can only presume that Petitioner will be removed or released if he succeeds with his legal challenge at some unspecified and unpredictable time in the distant future when Petitioner's legal challenge comes to a final resolution.

Therefore there is no telling that his case will be concluded in the near future. There is no certainty as to when his review will be completed. Respondents therefore should not detain Petitioner beyond the six months limit recommended by the Supreme Court in Zadvydas. Petitioner's detention is wrongful with respondent's only possible assertion for continued detention being that his detention will end at some unspecified and unpredictable time when his legal challenge comes to a final resolution. See D'Alessandro v. Mukasey, 628 F. Supp. 2d 368, 385 (W.D.N.Y. 2009). D'Alessandro. This honorable court held that D'alessandro was not afforded proper due process right and there was no likelihood of removal in the reasonable foreseeable future given his pending appeal at the BIA, making his departure not practically attainable in the reasonable foreseeable future. D'Alessandro's motion for a writ of Habeas Corpus was granted by this Honorable Court.

Courts in other Jurisdictions have made similar findings. See Koita et al. v. Reno, 2000 U.S. Dist. LEXIS 16417, No. 00-CV-4727 (E.D. Pa. Nov. 3, 2000) holding that indefinite detention without bond or parole violates a Petitioner's substantive and procedural due process rights. Petitioner will cooperate fully with his removal if it is sustained, when his judicial review is completed.

Since a majority of the factors in the multi-factor test weigh in my favor, particularly factor one pertaining to the excessive length of my detention, there is sufficient evidence to conclude that my detention is unreasonably prolonged.

Once the Court has found that detention is unreasonably prolonged, it moves to the second step of the two-step inquiry, which asks what specific due process rights should be afforded. *Hechavarria, 2018 WL 5776421 at *7-9.*

While it is established that inadmissible aliens or those subject to exclusion orders do not enjoy due process rights under the Fifth Amendment of the United States Constitution, several district courts have affirmed that courts have the power and responsibility to review the government's exercise of detention in cases involving inadmissible aliens. See Zadvydas v. Davis, 121 S. Ct. 2491, 2501 (2001) ("Aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law," quoting Shaughnessy v. United States ex rel Mezei, 345 U. S. 206, 212 (1953)). See also Clark v. Martinez, 125 S. Ct. 716, 160 L. Ed. 29 734, 73 ULLW 4100 (U.S. 2005).

The removal and his detention is prolonged. The Supreme Court's decision in Zadvydas that removable and excludable aliens are situated differently before an order of removal is entered. The Court went on to hold that both removable and inadmissible aliens are entitled to be free from detention that is arbitrary and capricious. The Court stated that six months was the maximum period of post order detention that was presumptively reasonable given the alien's fundamental liberty interest, Zadvydas, 533 U. S. at 692.

The Court in Patel v. Zemski, 275 F. 3d 299 (3d Cir. 2001) also stated that under Zadvydas immigration detention implicates a fundamental liberty interest

and that the INS is limited to a "period reasonably necessary to bring about the alien's removal generally no more than six month," id at 209 citing Zadvydas, 533 U. S. at 692.

Additionally, the Code of Federal Regulations recognizes that the Service's Headquarters Post-Order Detention Unit (HQPODU) must make a determination within a six month period as to whether there is a significant likelihood that the alien can be removed from the United States in the reasonably foreseeable future. See 8 C.F.R. §241.13(b)(2) (ii). Presumptive reasonable time established by the Supreme Court. Such prolonged detention is arbitrary and capricious since Petitioner's removal to Colombia is not likely to occur in the reasonable foreseeable future. Petitioner's final order of removal was September 24th, 2024, almost 12 months post-order detention.

Prior to the Supreme Court's decision in Zadvydas, courts in the third circuit determined that aliens are not subject to prolonged post-order detention. See Chi Thon Ngo v. INS, 192 F. 3d 390 (3rd Cir. 1999) ("Stakes are high and we emphasize that grudging and perfunctory review is not enough to satisfy the due process right to liberty, even for aliens"). In Chi Thon Ngo, the court found that the statue satisfied due process because it provided for "searching periodic reviews" of the basis for detention but granted the petitioner's writ of habeas corpus since he had not received the "rigorous reviews of his eligibility for parole that due process requires," id at 399.

Following Zadvydas, the Attorney General promulgated regulations establishing a process for determining the custody of aliens subject to prolonged detention awaiting execution of a removal order, see 8 C.F.R. §241.13, which applies to aliens such as Petitioner "who are subject to a final order of removal and

are detained under the custody review procedures provided at section §241.4 after the expiration or removal period. "Section 241.13 tracks Zadvydas's mandate in that it requires a deportable alien to first establish a basis that removal in the 'reasonably foreseeable future' is not possible," Jabir v. Ashcroft, No. CIV.A.03-2480, 2004 WL 60318, at 85 (E.D. La. Jan. 8, 2004).

## PETITIONER'S PROLONGED DETENTION VIOLATES THE UNITED STATES CONSTITUTION

A non-citizen who is detained may trigger HQPODU review of whether there is a significant likelihood of removal in the reasonably foreseeable future by written request, 8 C.F.R. §241.13(d). The HQPODU must respond to such a request within ten business days, acknowledge the request, and explain the process that will be followed to consider the request, 8 C.F.R. §241.13(e)(1). The HQPODU must assess the detainee's cooperation with removal efforts in addition to factors such as the history of ICE's "efforts to remove aliens to the country in question of third countries, . . . the ongoing nature of efforts to remove this alien, . . . the reasonably foreseeable results of those efforts, the views of the Department of State regarding the prospects of removal of aliens to the country or countries in question, and the receiving country's willingness to accept the alien into its territory," 8 C.F.R. §241.13(f). According to the regulations, while "there is no presumptive period of time within which the alien's removal must be accomplished, . . . the prospects of the timeliness of removal must be reasonable under the circumstances," 8 C.F.R. §241.13(g). If HQPODU determines that there is no significant likelihood that the alien will be removed in the reasonable foreseeable future, the alien is to be released, upon appropriate conditions, unless "special circumstances" exist, 8 C.F.R. §241.13(g)(1).

Special circumstances allowing the continued detention of non-citizen who are subject to removal but unlikely to be removed in the reasonably foreseeable future include those who pose a special safety risk to the public, in the sense that they carry contagious diseases, 8 C.F.R. §241.14(b); pose serious adverse foreign policy consequences, 8 C.F.R. §241.14(c); are being detained because of anti-terrorism concerns, 8 C.F.R. §241.14(d); or have been determined to be "specially dangerous," either because of the alien's criminal record or by virtue of mental illness, 8 C.F.R. §241.14(f).

ICE has not asserted that special circumstances exist to justify Petitioner's prolonged detention, or that Petitioner poses a danger to national security or that he's a flight risk. Thus, Petitioner alleges that his detention violates both substantive and procedural due process insofar as ICE has failed to conduct a periodic review of his status in accordance with its own procedures and has made no determination that he posed either a danger to society or a flight risk.

This Court should grant Petitioner's writ of habeas corpus because the government has failed to acknowledge its compliance with all of the obligations of his detention or provide another valid reason for his continued detention, and his unjustly prolonged detention deprives Petitioner of his liberty, see Chi Thon Ngo, 192 F. 3d at 393. There is no justifiable reason for his continued detention. Since Petitioner's detention has continued beyond the six-month post removal order period, his continued detention should be deemed an unlawful deprivation of his liberty, see Zadvydas, 522 U. S. 678.

Petitioner further contends that his prolonged detention without the possibility of bond violates the United States Constitution. Petitioner respectfully requests that this honorable court consider as persuasive authority the decision of the

United States Court of Appeals for the Third Circuit with respect to the application of the time limiting provision of 8 U.S.C. §1226 as preventing the prolonged detention of inadmissible or excludable aliens, see Patel v. Zemski, 275 F. 3d 299 (3d Cir. 2001) (holding that mandatory detention of aliens after they have been found subject to removal violates their due process rights unless they have been afforded the opportunity for an individualized hearing at which they can show that they do not pose a flight risk or danger to the community); Chi Thon Nog v. INS, 192 F. 3d 390, 398 (3d Cir. 1999) (same).

The Supreme court in Zadvydas, in order to void the serious due process concerns that would be presented by permitting detention for an indefinite period of time, construed 8 U.S.C. § 1231(a)(6) to authorize detention only where it is significantly likely that removal will occur in the reasonably foreseeable future. Zadvydas, 533 U.S. at 690. after a noncitizen meets his or her initial burden to show that no such likelihood of removal exists, the burden shifts to the government to "respond with evidence sufficient to rebut the noncitizen's showing." Id. at 701.

If Court finds removal is reasonably foreseeable, the Court may still order release, and may consider the risk posed by the individual to community safety in determining whether to do so. Id. at 700. While dangerousness may justify immigrant detention in certain cases, the Court "upholds preventive detention based on dangerousness only when limited to specially dangerous individuals and subject to strong procedural protections." Id. at 691.

I was released from federal custody on February 16, of 2021, on Pre-Sentencing probation. After two years and eight months on probation, Immigration

serves petitioner with a NTA September 23, 2023, during those two years and seven months, Petitioner was home reporting to Probation every month, maintaining a job, supporting his family. Petitioner has demonstrated to Federal Court while on Pre-Sentencing Probation that, petitioner is not a danger to the community or a flight risk. Petitioner lived peaceably in the community. In the two years and seven months on Pre-Sentencing Probation since his release, petitioner has not been arrested, let alone convicted of any crime, Nor violated Probation. Petitioner worked to support his family financially. Petitioner's parents, wife, kids , and sisters and brother are all U.S. Citizens or Permanent Residents lawfully in the United States, the place petitioner has called home since the age of nine.

My removal period began on September 24, 2024 My removal period expired on December 24, 2024, ninety days after its initiation. Petitioner is detained beyond the ninety days pursuant to 8 U.S.C. § 1231(a)(6). March 24, 2025 the 6-month presumptively reasonable period of detention has thus also expired. After expiration of the 90-day removal period, 8 U.S.C. § 1231(a)(6) allows the government to continue to detain certain classes of aliens or to release them, subject to appropriate terms of supervision. Id. In Zadvydas, the Supreme Court read "an implicit limitation into" § 1231(a)(6), holding that "the statute, read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States. It does not permit indefinite detention." 533 U.S. at 689.

The Zadvydas Court further adopted a 6-month "presumptively reasonable period of detention," and instructed that "[a]fter this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with

evidence [**8] sufficient to rebut that showing." Id. at 701; see also Wang, 320
F.3d at 146 ("The [Zadvydas] Court stated [*265] that detention is presumptively
reasonable for six months following a final removal order, and that, after the first
six months, detention violates § 241 if (1) an alien demonstrates that there is no
significant likelihood of removal in the reasonably foreseeable future and (2) the
government is unable to rebut this showing."). Further, "[w]hat constitutes the
'reasonably foreseeable future' will depend on the length of detention." Id.; see
Zadvydas, 533 U.S. at 701 ("[A]s the period of prior postremoval confinement [**
9] grows, what counts as the 'reasonably foreseeable future' conversely would
have to shrink."). "In effect, the parties' respective burdens shift as the length of
detention increases." Hassoun, 2019 U.S. Dist. LEXIS 451, 2019 WL 78984, at *4
(collecting cases).

The DHS's persistent inability to effectuate my removal provides threshold
evidence that there is not a significant likelihood of removal in the foreseeable
future. See Senor v. Barr, 401 F. Supp. 3d 420, 430 (W.D.N.Y. 2019) (quoting
Singh v. Whitaker, 362 F. Supp. 3d 93, 102-03 (W.D.N.Y. 2019)); see also
D'Alessandro v. Mukasey, 628 F. Supp. 2d 368, 404 (W.D.N.Y.2009) ("[T]he
burden upon the [detained person] is not to demonstrate no reasonably
foreseeable, significant likelihood of removal or show that his detention is
indefinite[.] . . .Rather, . . . the [detained person] need only provide good reason to
believe that removal is not significantly likely in the reasonably foreseeable
future.") (quoting parties' briefing in the case) (internal quotation marks omitted).

Accordingly, unless the Respondent can supply sufficient evidence to the contrary, they should now release me from their custody because my "continued detention [has become] unreasonable and [is] no longer authorized by statute." Zadvydas, 533 U.S. at 699-700. Even if the court determines that removal is reasonably foreseeable, this court should order my release because I am not a danger to the community. Id. at 700.

Petitioner requests a "constitutionally adequate" bond hearing. "[A] clear and convincing standard of proof, and consideration of the ability to pay and alternative conditions of release[,] are conditions most often ordered as constitutionally necessary." Doe, 2021 U.S. Dist. LEXIS 212817, 2021 WL 5112624, at *4 (collecting cases). The "overwhelming majority" of courts have concluded that the Government "must bear the burden of proof at a bond hearing by clear and convincing{2024 U.S. Dist. LEXIS 15} evidence," Garcia, 2023 U.S. Dist. LEXIS 97661, 2023 WL 3818464, at *6 (collecting cases), because "the Supreme Court has consistently held the Government to a standard of proof higher than a preponderance of the evidence where liberty is at stake," Hylton, 502 F. Supp. 3d at 856. And, a bond determination "that does not include consideration of financial circumstances and alternative release conditions is unlikely to result in a bond amount that is reasonably related to the government's legitimate interests." Rodriguez Sanchez, 431 F. Supp. 3d at 317.

For the reasons listed above the Petitioner and his supportive family request that the Petitioner be granted alternative to detention, so that he would not be separated from his family residing in the State of New York and remain in the country while his immigration case concludes. Petitioner requests a

"constitutionally adequate" bond hearing. "[A] clear and convincing standard of proof, and consideration of the ability to pay and alternative conditions of release, are conditions most often ordered as constitutionally necessary." Doe, 2021 U.S. Dist. LEXIS 212817, 2021 WL 5112624, at *4 (collecting cases). The "overwhelming majority" of courts have concluded that the Government "must bear the burden of proof at a bond hearing by clear and convincing{2024 U.S. Dist. LEXIS 15} evidence," Garcia, 2023 U.S. Dist. LEXIS 97661, 2023 WL 3818464, at *6 (collecting cases), because "the Supreme Court has consistently held the Government to a standard of proof higher than a preponderance of the evidence where liberty is at stake," Hylton, 502 F. Supp. 3d at 856. And, a bond determination "that does not include consideration of financial circumstances and alternative release conditions is unlikely to result in a bond amount that is reasonably related to the government's legitimate interests." Rodriguez Sanchez, 431 F. Supp. 3d at 317.

## FIRST CLAIM FOR RELIEF
### COUNT ONE

Petitioner  reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

Noncitizens who have been detained by DHS pursuant to its statutory authority under 8 U.S.C. § 1231(a) for over six months must be released from custody if there is no significant likelihood that they will be removed in the reasonably foreseeable future. Petitioner's PFR and stay are still pending in the Second Circuit Courts, there is still an Appeal process stage that we have not yet proceeded to the briefing stage which takes 90 day to file a brief, and six months to a year for Courts to process petition. Petitioner has asserted defenses to removal, seeking to terminate his removal order

Petitioner's continued detention by Respondent is unlawful and contravenes 8 U. S. C. §1231(a)(6) for over six months must be released from custody if there is no significant likelihood that they will be removed in the reasonably foreseeable future. Continuing to detain me under 8 U.S.C. § 1231(a)(6) while there is no significant likelihood of my removal in the reasonably foreseeable future deprives me of my "strong interest in liberty," and therefore violates the Fifth Amendment of the United States Constitution. U.S. v. Salerno, 481 U.S. 739, 750 (1987). It further poses actual and substantial hardships and irreparable injuries to me. I have no adequate remedy at law other than the instant petition for a writ of habeas corpus. The Supreme Court held in Zadvydas that the ICE's continued detention of someone like Petitioner under such circumstances is unlawful. Petitioner requests that the government show cause why his continued detention is justified.

## SECOND CLAIM FOR RELIEF

Petitioner alleges that in light of the equities in this case, his prolonged detention more than six months violates his right to substantive due process under the Fifth Amendment of the United States Constitution.

The Due Process Clause of the Fifth Amendment requires that the deprivation of Petitioner's liberty be narrowly tailored to serve a compelling government interest. While respondents would have an interest in detaining Petitioner in order to effectuate removal, that interest does not justify his indefinite detention. Zadvydas recognized that ICE might continue to detain aliens only for a period reasonably necessary to secure the alien's removal. The presumptively reasonable period during which ICE may detain an alien is only six-months, Zadvydas v. Davis, 533 U.S. 678 (2001). Petitioner has already been detained in excess of six

36

months and his removal is not significantly likely to occur in the reasonably foreseeable future.

## THIRD CLAIM FOR RELIEF

Petitioner alleges that in light of the equities in this case, his prolonged detention more than six months without a meaningful review of his detention in accordance with federal regulations violates his right to procedural due process under the Fifth Amendment of the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, I pray that this Court grants the following relief:

1. Assume jurisdiction of this matter;

2. Use its authority under 28 U.S.C. § 2243 to:

i. Order the Respondent to file an Answer and Return within 3 days of the filing of the petition, unless they can show good cause for additional time;

ii. Order Petitioner's Reply be filed 15 days after the Court sets the deadline for Respondent's Answer and Return;

3. Issue a writ of habeas corpus ordering the Respondent to immediately release Petitioner with reasonable terms of supervised release; and

4. Grant any further relief that this Court deems just and proper.

*I affirm, under penalty of perjury, that I am the petitioner, I have read this petition and the information in this petition, under the laws of the United States of America that the foregoing is true and correct pursuant to 28 U.S.C. § 1746*

DATED: 09 / 19 /2025

Notary

*[signature]*

Date 9 /19 /2025

Respectfully Submitted,

*[signature]*

Ramiro Loachamin Jaramillo
  A#036-438-940
Buffalo Federal Detention Facility
4250 Federal dr
Batavia,  N.Y 14020

Aaron A. Stahl
Notary Public, State of New York
Reg. No. 01ST0013537
Qualified in Orleans County
Commission Expires September 14, 2027

38

CERTIFICATE OF SERVICE

I,  hereby certify that on September 19, 2025, I caused to be served a true copy of the

**PETITON FOR WRIT OF HABEAS CORPS
AND SUPPORTING DOCUMENTS**

**X**  By sending via USPS First Class mail to:

copy of the above documents was addressed and mailed to
**Clerk of the United States District Court**
**UNITED STATES DISTRICT**
**100 STATE STREET**
**ROCHESTER, NY 14614:**

I certify under the penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 2241.

Dated: 09 /19/ 2025

Respectfully Submitted,

/s/ Rami Lutu

Ramiro Loachamin Jaramillo
A#036-438-940
Buffalo Federal Detention Facility
4250 Federal dr
Batavia,  N.Y 14020

Notary Public

Date 09/19 / 2025

Aaron A. Stahl
Notary Public, State of New York
Reg. No. 01ST0013537
Qualified in Orleans County
Commission Expires September 14, 2027

# ATTACHMENT "A"

## ( attachment NTA)

 

DEPARTMENT OF HOMELAND SECURITY
**NOTICE TO APPEAR**

DOB: 05/08/1972

Event No: ALB2307000083

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID: 386545019                    FINS: 1169230946        File No: 036 438 940

In the Matter of:

Respondent: RAMIRO LOACHAMIN JARAMILLO AKA: LOZANO, Hugo _____ currently residing at:

4250 Federal Drive Batavia,NEW YORK, 14020                    (585) 344-6500

(Number, street, city, state and ZIP code)                (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of COLOMBIA and a citizen of COLOMBIA;

3. On November 14, 1981, you were admitted to the United States at New York, NY as a lawful permanent resident (class IR-2);

4. On March 28, 1995, you were sentenced in the District Court of the County of Suffolk for the offense of criminal possession of stolen porperty, in violation of New York State Penal Law 165.40;

See Continuation Page Made a Part Hereof

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

See Continuation Page Made a Part Hereof

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:    ☐ 8CFR 208.30    ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

4250 FEDERAL DR RM F108 BATAVIA NY 14020. EOIR SPC Batavia, NY

(Complete Address of Immigration Court, including Room Number, if any)

on  October 12, 2023  at    9:00 AM    to show why you should not be removed from the United States based on the
      (Date)            (Time)

charge(s) set forth above.    _____
                              P 7108 SALMON - SDDO
                              (Signature and Title of Issuing Officer)

Date: September 21, 2023    _____
                            Malta, NY
                            (City and State)

DHS Form I-862 (6/22)

U.S. Department of Homeland Security          Continuation Page for Form    I-862

| Alien's Name<br>LOACHAMIN JARAMILLO, RAMIRO | File Number<br>036 438 940<br>Event No: ALB2307000083 | Date<br>09/21/2023 |
|---|---|---|

THE SERVICE ALLEGES THAT YOU:
--------------------------------

5. On February 16, 2005, you were sentenced in the Washington County Court of the State of New York for the offense of act in manner to injure child less than 17, in violation of New York State Penal Law 260.10-01;

6. On January 4, 2017, you were sentenced in the Saratoga County Court of the State of New York for the offense of attempted criminal sale controlled substance 3rd: narcotic drug, in violation of New York State Penal Law 110-220.39-01;

7. On or about November 17, 2019, you knowingly encouraged, induced, assisted, abetted or aided "J.F.P.R.", an alien, to enter or to try to enter the United States at or near Churubusco, New York, in violation of law; (7.) is the charge (8.) is conviction

8. On August 8, 2023, you were sentenced in the United States District Court for the Northern District of New York for the offenses of alien smuggling, in violation of Title 8 United States Code 1324(a)(2)(B)(ii) and transporting an alien, in violation of Title 8 United States Code 1324(a)(1)(A)(ii);

9. These crimes did not arise out of a single scheme of criminal misconduct.


ON THE BASIS OF THE FOREGOING, IT IS CHARGED THAT YOU ARE SUBJECT TO REMOVAL FROM THE UNITED STATES PURSUANT TO THE FOLLOWING PROVISION(S) OF LAW:
--------------------------------------------------------------------------------
--------------------------------------------------

Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act (Act), as amended, in that, at any time after admission, you have been convicted of an aggravated felony as defined in Section 101(a)(43)(B) of the Act, an offense relating to the illicit trafficking in a controlled substance, as described in section 102 of the Controlled Substances Act, including a drug trafficking crime, as defined in section 924(c) of Title 18, United States Code.

Section 237(a)(2)(B)(i) of the Immigration and Nationality Act, as amended, in that, at any time after admission, you have been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in Section 102 of the Controlled Substances Act, 21 U.S.C. 802), other than a single offense involving possession for one's own use of 30 grams or less of marijuana.

Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act (Act), as amended, in that, at any time after admission, you have been convicted of an aggravated felony as defined in section 101(a)(43)(N) of the Act, a law relating to an offense described in paragraph (1)(A) or (2) of section 274(a) of the Act (relating to alien smuggling), except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien''s spouse, child, or parent (and no other individual) to violate a provision of this Act.

Section 237(a)(1)(E)(i) of the Immigration and Nationality Act, as amended, in that prior to the date of your entry, at the time of any entry, or within five years of the date of any entry, you knowingly encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law.

| Signature<br>*P 7108 SALMON* | Title<br>SDDO |
|---|---|

Form I-831 Continuation Page (Rev. 08/01/07)

U.S. Department of Homeland Security | Continuation Page for Form **I-862**

| Alien's Name LOACHAMIN JARAMILLO, RAMIRO | File Number 036 438 940 Event No: ALB2307000083 | Date 09/21/2023 |
|---|---|---|

Section 237(a)(2)(E)(i) of the Immigration and Nationality Act, as amended, in that you are an alien who at any time after entry has been convicted of a crime of domestic violence, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment.

Section 237(a)(2)(A)(ii) of the Immigration and Nationality Act, as amended, in that, at any time after admission, you have been convicted of two crimes involving moral turpitude not arising out of a single scheme of criminal misconduct.

I want to apply

Relief: ① CAT Withholding of Removal based on
   - Convention Against Torture

② Termination — VSC — should be
   US
   Citizen
   my father
   is a veteran
   *(illegible)*
   *(illegible)*

| Signature *P 7108 SALMON* | Title SDDO |
|---|---|

Form I-831 Continuation Page (Rev. 08/01/07)

# ATTACHMENT "B"

**DHS's 90 DAY AND 180 DAY CUSTODY REVIEW TO
PETITIONER**

**documents in support of  180 day Custody Review:
Petitioner's affidavit;
Support Letters and Employer letter**

Ramiro Loachamin Jaramillo
A#: 036-438-940
Buffalo Federal Detention Facility
4250 federal dr.
Batavia, NY 14020

Post-Order Detention Unit and 180 day custody interview
U.S. Department of Homeland Security
Immigration and Customs Enforcement

To whom it may concern;

I am writing this letter to communicate the difficulties and extreme hardship that has raised for my family and I.

Hello my name is Ramiro Loachamin and I am 53 years old, from South America Colombia, a country I am no longer familiar with as I have resided here in the United States since I was 9 years old, I came as a Lawful Permanent Resident to the United States in 1981, with my sisters and our parents to give us a better life. For over 44 years now, I have been a U.S. Lawful Permanent Resident. I graduated from Brentwood High School in Long Island, N.Y. and graduated in 1992, did 2 years of B.O.C.E.S. In aviation training. I have worked since my 10th grade of high school. Through out the years of my life I have had running's with the law, mostly cause of the bad influences and the use of drugs, for which I took responsibility for my actions and pled guilty to the charges. I have served my full time and completed all my programs through the years, getting myself ready to be apart of society again.

I am married for over 13 years now, I father two U.S. Citizen children and raised three step-children ages ranging from the eldest being 24 years of age to the youngest being 14 years of age, I Also have a U.S. Citizen And lawful permanent resident family who all live in the U.S. longer then me, For instance; mother, father, sisters, brother nieces, nephews, aunts, uncles, cousins most of my immediate family live in N.Y. State. My wife and children at this moment are encountering extreme hardship as I was their main provider. Not only are they currently being affected by

me not being able to provide for them emotionally but financially also, but now my family is going through hard financial stress from which I have not been able to continue to provide for them being detained now for over 14 months, and also impacted by emotional distress since my absence. I was strongly committed to my family on maintaining a family structure.

I ask for the opportunity to continue to financially support, and to raise and guide my family, so that they are given the best opportunity in life and I may guide them in making the best decisions, and having me present in their lives is an essential part of their development in becoming well respected citizens in this society by offering them stability and continuity as a father should,  and not let them make the same mistakes as I have done.

I am unable to take them to live with me in a country unknown to me and to them, nor an unfamiliar language, as they were all born and raised in Saratoga Springs N.Y. and only received schooling in this country as myself. Taking my family elsewhere will also cause psychological and emotional challenges. I have no idea how I will make a living and be able to make ends meet, to be able to support myself and provide for my family here in the United States.  I ask that you take in consideration the emotional and financial need my family has been receiving from me their entire lives and allow me to continue to be present in their lives and to support and nurture them in this manner as I am completely involved in my family's lives. I know that they are in so much need of their father at this moment and are experiencing extreme hardship by me not being able to be there now and in the future, my kids are still growing and there's so much to be done at home from me. I ask for your pardon and forgiveness and any and all inconvenience I may have caused at this moment.

I am committed to continuing to be the best husband, father and a  well rounded citizen. I have worked all my adulthood life, paid my taxes for over 35 years. I am a hard worker, in my recent job from 2017, I started as a part-time prep cook and in little time with hard work and dedication became a team lead which is a department supervisor, now been with the a company for a little over 6 years, I am still welcome back at my job.

I apologize for my mistakes and regret all my wrong doing, but I have tried to

correct my wrong doing by helping the same government agency that is trying to deport me DHS by being a confidential informant, I was on pre-sentencing federal probation from February 2020 for almost 3 years before being detained by immigration in September 2023 with good conduct, while out on pre-sentencing probation from 2020

I was approached by DHSI agent named Trevor Kinblom and his Supervisor from the northern district of NY to be a confidential informant for them on a investigation that lasted almost 3 years while I was on Federal Probation, therefore I should not be consider a danger, nor a threat to the community.

Once again, on this 180 day custody interview I ask for your pardon and consideration to allow me to proceed my immigration case on a deferred detention alternative program as may be suited, and continue to be an essential part of my family's lives. To continue to provide financially, and emotional mental support they still need. while my case is still pending

*Statement Pursuant to 28 U.S.C. & 1746, I Declare, under the penalty of Perjury under the laws of the United States of America, that the foregoing is True and Correct.*

*Dated:* 08/18/2025

Respectfully Submitted,

Ramiro Loachamin

*Denise Salage*
St. Clement's Church
231 Lake Avenue
Saratoga Springs, NY 12831
518-587-3611 ext. 3 / salage.d@scpny.org

To whom it may concern,

I am writing to you to in support of Ramiro Loachamin in that he is of good moral character and not a threat to society. From my perspective as a pastoral associate for children's sacraments, Ramiro is is a faith filled and hardworking man trying to make the best choices for his family. I can say this because I have come to know Ramiro over about a 10 year period as a faith filled man, a good husband to Gloria, and a strong father figure, good role model, and a good provider for his three stepchildren, Luis, Emily, and Abraham. Ramiro comes regularly to the 1:00 pm Mass, contributes to fellow-ship which happens after the Mass, and when he is able participates in adult faith formation classes.

I was able to get to know Ramiro on a more personal basis from 2017 to 2018 when his stepchildren Luis and Emily were preparing for the sacraments of Reconciliation and First Holy Communion. Ramiro exemplified being a responsible parent by helping his stepchildren prepare for the sacraments and personally take part in the sacrament preparation process. Ramiro would bring his stepchildren to faith formation classes on time and regularly. His youngest stepson, Abraham is now preparing for the Sacraments of Baptism and First Holy Communion. Unfortunately, Abraham's preparation is challenging at this time because his stepfather is unable to be with and nurture him as Ramiro was able to do for Luis and Emily. What stands out most to me is Ramiro lives out his Christian faith by being a good husband and stepfather as well as reaching out to help other persons in need. I miss Ramiro and I am sure Gloria and his stepchildren miss him too. My hope is that Ramiro will be back at St. Clement's Parish in the near future. If you have any questions about Ramiro please do not hesitate to contact me at 518-587-3611, ext. 3 or salage.d@scpny.org.

Sincerely yours in Christ the Redeemer,

*Mrs. Denise Salage*

Mrs. Denise Salage
Pastoral Associate for Children's Sacraments

Savannah Meyre
Saratoga Springs, NY, 12866
(518 450-8833
skmeyre5@gmail.com

To Whom it May Concern:,

This letter is written in regards to Ramiro Loachamin who was once an assistant manager of Market 32:
Price Chopper as well as my former co-worker.

My name is Savannah Meyre and I am a 23 year old college student working towards my degree to
become an RN (Registered Nurse). I have worked at Price Chopper for 7 years and hold a very unique
position in the company. Due to the need of my demanding school work I am a part time/full time
supervisior. (While school is in session, I am part time; when school is out of session, I instantly am on a
full time schedule.) This type of position isn't standard for everyone; I have this position due to my
accellerated knowledge that is equivalent to a manager's which of course is in addition to my robust work
ethic. As a nursing student, you can imagine that I practice sheer honesty which is exactly what is
intended in this letter.

I am not entirely sure when Ramiro Loachamin started working for Market 32 but I do know he has been
with the company for approximately 2 years. I (along with another assistant manager at the time, Theresa
Little) helped train Ramiro as a part-time employee in the food service/deli department.

This particular department isn't hard, however, it is a lot of work but not much pay. We are always the
most understaffed, demanding department in the store and have gone through numerous employees.
Ramiro was one of the few who kept pushing through no matter the circumstance. While working in this
department I have found that there are two types of people.

Type 1: the "non-stoppers"

Type 2: "the breakers"

Ultimately, the decision is yours as to which category you decide to put yourself in. The "non-stoppers'" do

not stop moving while the "breakers'"take advanatge of every break possible. Yes, I am a non-stopper. Yes Ramiro was a non-stopper. "Type 1" is hard to find, we are extrordinarily rare. "Why work yourself to death for a grocery store?" some may ask. The answer is always the same, "There's so much to do, we don't wanna be behind." In all honesty, it's a vicious cycle we get caught up in. We want to prove we can get ahead and make things steady for everyone as a team, but truthfully, we are fooling ourselves and deep down we know it but won't ever admit it verbally. I knew Ramiro was going to be an asset once he decided to be like the type 1 people. This decision (to be a "non-stopper") isn't forced on anyone, this isn't an official thing that was stated by anyone, this is simply something that I've concluded by observing for years entirely on my own. I'm sure someone, somewhere could do the digging if they wanted to and investigate Ramiro's time punches at work. IF there was a "lunch" punch, Ramiro would work through it out of fear that we would be behind (as would I). Truth be told, I don't ever remember Ramiro leaving the department to go to the restroom, let alone have a break.

Ramiro (for whatever reason), wanted to strive in this company. He wanted to be more for himself and his family and with that said, I showed him the ropes as far as managerial stuff: ordering, shrinking, dexing, scheduling, cycle counting, inventory etc. With his determination, he absorbed all of this information rather quickly, he was on call whenever we needed him and never said, "I can't"; he always wanted to learn and do more. In all of my seven years, I have never met another employee like this (not even the other official managers that I've trained.).

Ramiro was soon given an assistant manager position. Unfortunately, he was considered a "bench", meaning if he was needed in another store he wouldn't have a choice and would have to go. Although Ramiro didn't mind the fact that he could be abruptly taken from us, everyone else did mind. This was because everyone knew we could be losing one of our strongest workers in the department which ultimately did happen. Ramiro ended up working in one of the most busiest, most profiting stores in our entire zone, Market Bistro because of who he is.

Ramiro could've and would've continued to climb up the ladder in the company, I am beyond certain of that. If given another chance, I know he would do it again. Many managers in many different stores are relatively aware of Ramiro's current situation and are eager for his possible return. Maybe it's the "caring" characteristic in me, but Ramiro is one of a kind who wants to make a difference in his life in a positive light. I sincerely ask that you do not take that away from him. If there are any questions please feel free to contact me at your leisure.

Sincerely,



Savannah Meyre.



To Whom It May Concern:

My name is Melina Knowlton and I am one of many assistant managers of Market 32: Price Chopper (store #158 of Saratoga Springs, NY). I am free-willingly writing this letter on behalf of Ramiro Loachamin with high hopes to shed some on his influential character.

In April of 2019, I was transferred to store #158 for further, in-depth training on my current position. During this time, I met Ramiro who was a bench assistant manager in the food service department. While being at this store, I've learned many things about Ramiro in such a short period of time and was instantly impressed! I have been with this company for five years while Ramiro has been with us for less than half of my time served. Somehow, Ramiro was able to conquer information that I have yet to even hear of let alone know how to do. With his strong sense of knowledge and skill, Ramiro was able to help me flourish in my own ways as a manager as he passed down what he knows. He has had an incredible impact on my growth which is now innate in my line of work that I can forever take with me in the future paths I walk along. There isn't enough    gratitude I could possibly give to him.

Around late August of 2019, the unfortunate decision was made by a higher power to gift Ramiro Loachamin to another store due to their desperate need of help as well as to  further develop his expertise as an assistant manager. All in all, if I had the authority, I would've kept Ramiro Loachmin in store 158 without the slightest hesitation. Ramiro helps to build a resilient team that works efficiently and effectively. With that being said, the department went through a great loss and significant change. Yes, we were still able to keep afloat without him but it was incredibly hard and frustrating. Ramiro Loachamin was a core of the department. If we needed someone to come in early or stay late we always knew he would come. Never once has Ramiro said, "no." Even in times when Ramiro would have to close a naturally 4-man department down completely by himself, he continued on without a complaint. He actually has done that on several occasions and truthfully, even with the overtime offered, doing it alone still wasn't worth it. He put his best foot forward and would sign up for it every single time while everyone else would put their heads down and pretend not to hear the question, "Who's willing to stay tonight?"  There is no wonder why Ramiro got the position that he did in such little time. He is an impeccable worker and complains little to none. His persistence is what drives everyone around him and is one of few who deserves leniency and forgiveness. My contact information is as listed below and can be used at your pleasure in regards to Ramiro Loachamin. I wholeheartedly thank you for your time.

Sincerely,

Melinda Knowlton



**MY PRICE CHOPPER**

*To whom it may concern,*

*This letter is regarding Ramiro Loachamin. Ramiro started part time with us and worked his way up into management, he has worked hard and was always on time, he never called in and always showed up for his scheduled shift. His teammates respect him and always worked hard for him. The store has missed his presents here at market 32. Ramiro will have a job waiting for him when he is released.*
*We hope to see him soon.*

*~Toni Clark, Store manager*
*#39 Wilton Market 32*
*3049 NY-50, Saratoga Springs, NY 12866*

Phone # 518-583-7551



**Department of Corrections and Community Supervision**

KATHY HOCHUL
Governor

DANIEL F. MARTUSCELLO III
Commissioner

February 4, 2025

Ramiro Loachamin A# 036 438 940
B.F.D.F.
4250 Federal Drive
Batavia, NY 14020

RE:    Parole Discharge
NYSID:  07625038H
DIN:    17A0137

To Whom It May Concern,

Please find enclosed a copy of the Department of Corrections and Community Supervision Final Discharge Certificate for the above-named individual. This certificate should act as confirmation that they are no longer under the supervision of the New York State Department of Corrections and Community Supervision.

If you need additional information, please contact this office at (518) 473-9400.

Sincerely,

S. King

S. King
Assistant to Director of Internal Operations
NYS Corrections and Community Supervision

STATE OF NEW YORK

DEPARTMENT OF CORRECTIONS

AND COMMUNITY SUPERVISION


CERTIFICATE OF FINAL DISCHARGE
————————————————————————


This is to certify that

NAME: RAMIRO LOACHAMIN
DIN: 17A0137
NYSID: 07625038H




Has been discharged from sentence or a period of Post-Release
Supervision by New York State Department of Corrections and
Community Supervision


EFFECTIVE DISCHARGE DATE: 10/11/2018




AREA:       NORTHEAST
SPO:        THAYER,ROBERT
PO:         VANAMBURGH,PAMELA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK
## PROBATION AND PRETRIAL SERVICES

**Michael J. Kester**
Chief U.S. Probation Officer

**Janna A. Kulakowski**
Deputy Chief U.S. Probation Officer



James T. Foley U.S. Courthouse
445 Broadway, Room 347
Albany, New York 12207
(518) 257-1700
Fax (518) 257-1701

May 2, 2025

Ramiro Loachamin
Buffalo Federal Detention Facility
4250 Federal Drive
Batavia, New York, 14020

Dear Ramiro Loachamin,

Effective 5/7/2025, you completed your term of supervision in the Northern District of New York. We have provided some information that may help to answer questions regarding your rights and may also assist you with your transition off supervision.

Should you require any additional information, please contact our office at (518) 257-1700.

Sincerely,

Casullo, Dan

*Office of Enforcement and Removal Operations*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536



**U.S. Immigration
and Customs
Enforcement**

Loachamin Jaramillo, Ramiro                                    A 036 438 940
C/O Immigration and Customs Enforcement
Buffalo Field Office

### Decision to Continue Detention

This letter is to inform you that the U.S. Immigration and Customs Enforcement (ICE) has reviewed your custody status and determined that you will not be released from custody at this time. This decision was based on a review of your file record, personal interview and consideration of any information you submitted to ICE reviewing officials and upon review of the factors for consideration set forth at 8 C.F.R. § 241.4(e), (f), and (g).

You are a native and citizen of Colombia. You have previously been removed from the United States subsequent to a removal order issued by an Immigration Official. Your removal order was reinstated, and you claimed fear of returning to Colombia. An Asylum Pre-Screening Officer determined you had established reasonable fear, and your case was referred to an Immigration Judge (IJ). An Immigration Judge (IJ) denied all relief and ordered you removed to Colombia on April 11, 2024. The Board of Immigration Appeals reviewed your case and dismissed it on October 8, 2024. On October 24, 2024, you filed a stay with the Second Circuit Court.

Due to your pending case, ICE is unable to move forward with your removal from the United States at this time. Pending a ruling on your case, ICE has reason to believe there's a significant likelihood that your removal will occur in the reasonably foreseeable future, therefore you are to remain in ICE custody at this time, as ICE is unable to conclude that the factors set forth at 8 C.F.R. § 241.4(e) have been satisfied do to the likelihood that you will be removed.

This decision, however, does not preclude you from bringing forth evidence in the future to demonstrate a good reason why your removal is unlikely. You are advised that pursuant to Section 241(a)(1)(C) of the Immigration and Nationality Act (INA) you must demonstrate that you are making reasonable efforts to comply with the order of removal, and that you are cooperating with ICE efforts to remove you by taking whatever actions ICE requests to affect your removal.

You are also advised that any willful failure or refusal on your part to make timely application in good faith for travel or other documents necessary for your departure, or any conspiracy or actions to prevent your removal or obstruct the issuance of a travel document, may subject you to criminal prosecution under 8 USC § 1253(a).

SAMUEL M   Digitally signed by
                  SAMUEL M EDWARDS
EDWARDS    Date: 2025.04.14
                  17:05:40 -04'00'

_____                    4/14/2025
Unit Chief - HQ RIO                         Date

**Decision to Continue Detention**
Loachamin Jaramillo, Ramiro, A036 438 940
Page 2

## PROOF OF SERVICE

**(1)  Personal Service (Officer to complete both (a) and (b) below.)**

    (a)    I _____Cramer_____ , _____DO_____ ,
                Name of ICE Officer                Title

certify that I served _____Ramiro Loachamin Jaramillo_____ with a copy of

this document at _____BiPDF_____ on ___4/17/25___ , at ___0800___ .
                      Institution                  Date          Time

    (b)    I certify that I served the custodian _____ ,
                                            Name of Official

_____ , at _____ , on
        Title                              Institution

_____ with a copy of this document.
    Date

## OR

**(2)  Service by certified mail, return receipt.  (Attach copy of receipt)**

    I _____ , _____ , certify
                Name of ICE Officer                Title

that I served _____ and the custodian _____
                Name of detainee                Name of Official

with a copy of this document by certified mail at _____ on _____ .
                                      Institution          Date

Detainee Signature: ___Ramiro Loachamin___     Date: ___4/17/25___

( ) cc:  Attorney of Record or Designated Representative
( ) cc:  A-File

*Office of Enforcement and Removal Operations*

U.S. Department of Homeland Security
500 12th Street, SW
Washington, D.C. 20536



**U.S. Immigration
and Customs
Enforcement**

Loachamin Jaramillo, Ramiro                          A036 438 940
C/O Immigration and Customs Enforcement
Buffalo Field Office

### Decision to Continue Detention

This letter is to inform you that the U.S. Immigration and Customs Enforcement (ICE) has reviewed your custody status and determined that you will not be released from custody at this time. This decision was based on a review of your file record, personal interview and consideration of any information you submitted to ICE reviewing officials and upon review of the factors for consideration set forth at 8 C.F.R. § 241.4(e), (f), and (g).

You are a native and citizen of Colombia. You last entered the United States in 1981 as a Lawful Permanent Resident. A review of your criminal history reveals multiple convictions. Most recently for alien smuggling. While on federal probation, you were arrested and issued a Notice to Appear pursuant to Section 237(a)(2)(A)(iii), 237(a)(2)(B)(i), 237(a)(1)(E)(i), and 237(a)(2)(E)(i) of the Immigration and Nationality Act (INA). On April 11, 2024, an Immigration Judge (IJ) ordered your removal to Colombia. You reserved appeal. On October 8, 2024, the Board of Immigration Appeals (BIA) dismissed your appeal. On October 22, 2024, you filed a Petition for Review (PFR) with the 2nd Circuit Court.

Due to your pending case, ICE is unable to move forward with your removal from the United States at this time. Pending a ruling on your case, ICE has reason to believe there's a significant likelihood that your removal will occur in the reasonably foreseeable future, therefore you are to remain in ICE custody at this time, as ICE is unable to conclude that the factors set forth at 8 C.F.R. § 241.4(e) have been satisfied do to the likelihood that you will be removed.

This decision, however, does not preclude you from bringing forth evidence in the future to demonstrate a good reason why your removal is unlikely. You are advised that pursuant to Section 241(a)(1)(C) of the Immigration and Nationality Act (INA) you must demonstrate that you are making reasonable efforts to comply with the order of removal, and that you are cooperating with ICE efforts to remove you by taking whatever actions ICE requests to affect your removal.

You are also advised that any willful failure or refusal on your part to make timely application in good faith for travel or other documents necessary for your departure, or any conspiracy or actions to prevent your removal or obstruct the issuance of a travel document, may subject you to criminal prosecution under 8 USC § 1253(a).

SAMUEL M     Digitally signed by
                        SAMUEL M
EDWARDS     EDWARDS
                        Date: 2025.04.22
                        22:23:40 -04'00'

_____                    4/22/2025
Unit Chief - HQ RIO                                                    Date

www.ice.gov

**Decision to Continue Detention**
Loachamin Jaramillo, Ramiro, 036 438 940
Page 2

## PROOF OF SERVICE

**(1)     Personal Service (Officer to complete both (a) and (b) below.)**

(a)     I _____ Cramer _____, _____ DO _____,
                Name of ICE Officer                                        Title

certify that I served _____ Ramiro Loachamin Jaramillo _____ with a copy of
                                    Name of detainee

this document at _____ BF DF _____ on _____ 4/24/25 _____, at _____ 0800 _____.
                        Institution                        Date                        Time

(b)     I certify that I served the custodian _____,
                                                    Name of Official

_____, at _____, on
            Title                                    Institution

_____ with a copy of this document.
        Date

## OR

**(2)     Service by certified mail, return receipt.  (Attach copy of receipt)**

I _____, _____, certify
            Name of ICE Officer                        Title

that I served _____ and the custodian _____
                    Name of detainee                                    Name of Official

with a copy of this document by certified mail at _____ on _____
                                                            Institution                        Date

Detainee Signature: _Ramiro Loachamin_ _____  Date: _4/24/25_ _____

( ) cc: Attorney of Record or Designated Representative
( ) cc: A-File

# OFFICE OF THE FEDERAL PUBLIC DEFENDER
# FOR THE NORTHERN DISTRICT OF NEW YORK



**Syracuse Office**

4 Clinton Square
3RD FLOOR
SYRACUSE, NY 13202
(315) 701-0080
(315) 701-0081 FAX

**Albany Office**

54 State St.
3RD FLOOR
ALBANY, NY 12207
(518) 436-1850
(518) 436-1780 FAX

August 4, 2023

Hon. Glenn T. Suddaby
United States District Judge
James M. Hanley Federal Building
100 S. Clinton Street
Syracuse, NY 13202

       **RE:**    **United States v. Ramiro Loachamin**
                **Case No.: 20-CR-46 (GTS)**

<u>**CONFIDENTIAL SUBMISSION- NOT TO BE FILED**</u>

Dear Judge Suddaby:

    As you are aware, on November 19, 2020, Ramiro Loachamin entered a guilty plea to both counts contained in the indictment, and is scheduled to be sentenced on August 8, 2023. I am submitting this confidential submission in accordance with the local rules and in further support of a motion for downward departure of his sentence as requested in our sentencing memorandum. We ask this Court to consider Ramiro's cooperation with law enforcement in the hopes this Court will depart five (5) levels. We further ask this Court to sentence Ramiro to time-served. At the time of his sentencing, he will have served 14 months and 16 days, and is facing potential immigration proceedings at the conclusion of this case.

## Summary of cooperation

    Ramiro met and proffered with law enforcement agents and discussed in detail his involvement in the current offense, and the involvement of others. He provided names, phone numbers, and specific information about crimes being committed by other individuals he knew. As it related alien smuggling, he told agents about specific farms that he knew were involved, and provided detailed information about two other people involved. Specifically, he told agents that a man named Jose used to work on a farm in Malone, and he was helping people cross the border illegally from Canada. Another man named Miguel was doing the same thing. Ramiro explained that Jose had contacted him the night before the offense, and told him that he had 3 guys up at the border, and that something had happened, and one guy took off. He asked Ramiro

to pick the straggler up, to which Ramiro eventually agreed. Ramiro also provided information about individuals also incarcerated in the Clinton County Jail who were known to be involved in alien smuggling. He provided information about a man named Vladimir who was a coyote, and had recently crossed a polish man. Another man named Malik had crossed several people with the last name Patel. Ramiro told agents that Malin owns a limo company in New Jersey, and is involved with both crossing people and picking them up.

Ramiro showed agents the contact information he had for Miguel and Jose in his phone, using WhatsApp. He provided specific location details for farms involved. He further provided a phone number for a woman who he knew to produce fake documents, and a phone number for a woman who lives in Lowville and routinely picks people up at the border.

The agents expressed interest in the individuals who were producing fraudulent documents. Ramiro worked with the agents to cooperate proactively against these individuals. In doing so, he met with agents to formulate a plan to conduct controlled phone calls to certain targets who were suspected to be involved in creating fraudulent immigration documents, and eventually made the controlled calls. During the controlled calls he arranged to purchase fraudulent documents. He successfully purchased both a fraudulent driver's license and fraudulent legal permanent resident card from a target. He provided substantial assistance to law enforcement in their investigation of these individuals, and provided meaningful information which was able to be corroborated through his actions. He remains willing to cooperate if needed, and to testify if needed.

### Cooperating implicated his safety

Ramiro cooperated proactively while out of custody. He contacted people that he knew, and engaged them in conversations related to their criminal activity. He routinely had contact with individuals who were engaged in criminal activity, and used his own name and information to communicate with them. Doing so implicated his safety because these individuals were being investigated, and Ramiro was on the front-lines helping the investigation into people that he himself knew.

### Substantial assistance

Throughout the course of his cooperation, Ramiro has remained willing to provide information, to cooperate proactively, and to testify as needed. He has remained in contact with defense counsel about information he can provide, how he can cooperate proactively, and he has truthfully provided this information to law enforcement. Ramiro has provided substantial assistance to the government in the investigation of individuals known to law enforcement. He participated in proffers, cooperated proactively, and remained willing to provide whatever assistance was necessary. He provided truthful information which was found to be credible. The information he provided was used to investigate several other individuals. Ramiro provided a wealth of information about alien smuggling near the border and gave an enormous amount of details including the specific locations of farms involved, the names and contact information of others involved, and the names of the coyotes used to cross the people. He further provided significant information about individuals producing fraudulent documents, and cooperated

proactively against these individuals. He was successful in purchasing fraudulent documents on behalf of law enforcement.

Ramiro was truthful, forthcoming, and candid about his own involvement and the involvement of others. He did not attempt to protect anyone, nor did he minimize his own behavior. We ask that the Court consider Ramiro's cooperation as a mitigating factor in determining his sentence and imposing a sentence beneath the guideline range and statutory mandatory minimums. See U.S.S.G. §5K1.1 (commentary) and 18 U.S.C. §3553(e). We submit that a departure of five (5) levels is appropriate given the importance of the information he provided, the usefulness of his proactive cooperation, his role in the investigation of others, and his commitment to helping the government in their investigations into multiple other individuals.

Ramiro's offense level is 10, which when paired with his criminal history category III results in a guideline range of imprisonment of 10-16 months. However, because Ramiro is facing a 36-month mandatory minimum, his offense level becomes 17. A departure of five (5) levels would reduce his offense level to 12, which would result in a guideline range of imprisonment of 15-21 months. Ramiro has already served 14 months and 16 days.

Thank you for your consideration in this matter.

Respectfully,

OFFICE OF THE FEDERAL PUBLIC DEFENDER

By:     *s/Gabrielle DiBella*
        Assistant Federal Public Defender

cc:     AUSA Jeff Stitt, by email



**United States Department of Justice**

*United States Attorney*
*Northern District of New York*

---

445 Broadway, Room 218          Tel.: (518) 431-0247
James T. Foley U.S. Courthouse  Fax: (518) 431-0249
Albany, New York 12207-2924

August 4, 2023

**CONFIDENTIAL NOT TO BE FILED**

Hon. Glenn T. Suddaby
U.S. District Judge
Federal Building and U.S. Courthouse
P.O. Box 7367
Syracuse, New York 13261-7367

Re:    **United States v. Ramiro Loachamin**
       **Case No. 8:20-CR-046 (GTS)**

Dear Judge Suddaby:

The purpose of this letter is to advise the Court of the nature and extent of the assistance that defendant Loachamin provided to law enforcement pursuant to an agreement between the defendant and the United States, and that the United States does intend to make a motion for a downward departure pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e) from the applicable Sentencing Guidelines range and statutory mandatory minimum sentence in this case at sentencing, currently scheduled for August 8, 2023 before your Honor in Albany, New York.

We are providing this information in an unfiled confidential letter, a copy of which is being provided to defense counsel, because public disclosure of this defendant's efforts to provide substantial assistance in the investigation or prosecution of one or more other persons who have committed offenses could jeopardize an ongoing federal criminal investigation by revealing the existence of that investigation to potential targets and subjects of the investigation.

The United States intends to move for a -2 departure for the following reasons:

The defendant proffered with law enforcement agents and described his previous involvement in alien smuggling and how he became involved in smuggling. The defendant made controlled phone calls to targets that he believed were producing fraudulent documents. The defendant successfully purchased a fraudulent driver's license and legal permanent residence card from a target in California. The defendant's assistance provided Homeland Security Investigations meaningful intelligence in identifying co-conspirators and their means and ability to produce fraudulent government documents.

Letter to Judge Suddaby, District Court Judge
United States v. Loachamin
Case No. 8:20-CR-046 (GTS)
August 4, 2023
Page 2

        Thus, it is the government's position that the defendant's total offense level is 10, and he is in criminal history category III, resulting in an advisory guidelines imprisonment range of 10 to 16 months. Because the defendant is subject to a mandatory minimum term of imprisonment of 36 months, under the guidelines, his imprisonment range becomes 36 months. With the government's anticipated departure motion under U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e), and applying *Richardson,* criminal history category III, offense level 17 calls for a guidelines sentence of 30-37 months. *See United States v. Richardson,* 521 F.3d 149 (2d. Cir. 2008). The government proposes a one-level departure from level 17 to level 15, which yields an advisory guidelines range of 24-30 months.

        Because of the above-stated concerns, and based on the policy of the Federal District Court for the Northern District of New York prohibiting "reference to or mention of any cooperation or assistance provided by the Defendant or the nature of any resulting downward departure motion" (as set out in "Waiver of Rule 11 Right to Open Court Discussion and Record of the Defendant's Cooperation or Assistance"), the government will avoid mention in open court of a government motion for departure at the defendant's sentencing. Accordingly, the government respectfully requests that the Court interpret the government's silence at sentencing as the equivalent of the government having made a departure motion consistent with the terms set out in this letter. If circumstances change between the time of this letter and sentencing that affect the government's intent to move for departure as stated here, the government will bring that change to the Court's attention. If the Court prefers that the government make a motion on the record rather than having to interpret the government's silence as a motion, the government asks that the Court provide the government an opportunity to make its motion in an in camera hearing that is not reflected in the transcript of the in-court sentencing hearing.

                                        CARLA B. FREEDMAN
                                        United States Attorney

                        By:    /s Jeffrey C. Stitt
                                        Jeffrey C. Stitt
                                        Assistant United States Attorney
                                        Bar Roll No. 520195

cc:    Gabrielle DiBella, Esq.
        Craig Penet, Senior U.S. Probation Officer

                        **CONFIDENTIAL NOT TO BE FILED**

# ATTACHMENT  "C"

**( N.Y.S. Parole and Federal  probation termination letters).**

 **NEW YORK STATE** | **Department of Corrections and Community Supervision**

KATHY HOCHUL
Governor

DANIEL F. MARTUSCELLO III
Commissioner

February 4, 2025

Ramiro Loachamin A# 036 438 940
B.F.D.F.
4250 Federal Drive
Batavia, NY 14020

RE:    Parole Discharge
NYSID: 07625038H
DIN:    17A0137

To Whom It May Concern,

Please find enclosed a copy of the Department of Corrections and Community Supervision Final Discharge Certificate for the above-named individual. This certificate should act as confirmation that they are no longer under the supervision of the New York State Department of Corrections and Community Supervision.

If you need additional information, please contact this office at (518) 473-9400.

Sincerely,

S. King

S. King
Assistant to Director of Internal Operations
NYS Corrections and Community Supervision

STATE OF NEW YORK

DEPARTMENT OF CORRECTIONS

AND COMMUNITY SUPERVISION

CERTIFICATE OF FINAL DISCHARGE

This is to certify that

NAME: RAMIRO LOACHAMIN
DIN: 17A0137
NYSID: 07625038H

Has been discharged from sentence or a period of Post-Release
Supervision by New York State Department of Corrections and
Community Supervision

EFFECTIVE DISCHARGE DATE: 10/11/2018

AREA:          NORTHEAST
SPO:           THAYER,ROBERT
PO:            VANAMBURGH,PAMELA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK
### PROBATION AND PRETRIAL SERVICES

**Michael J. Kester**
Chief U.S. Probation Officer

**Janna A. Kulakowski**
Deputy Chief U.S. Probation Officer



James T. Foley U.S. Courthouse
445 Broadway, Room 347
Albany, New York 12207
(518) 257-1700
Fax (518) 257-1701

May 2, 2025

Ramiro Loachamin
Buffalo Federal Detention Facility
4250 Federal Drive
Batavia, New York, 14020

Dear Ramiro Loachamin,

Effective 5/7/2025, you completed your term of supervision in the Northern District of New York. We have provided some information that may help to answer questions regarding your rights and may also assist you with your transition off supervision.

Should you require any additional information, please contact our office at (518) 257-1700.

Sincerely,

Casullo, Dan

# ATTACHMENT  "D"

## ADA STITT AND PD GABRIELE
## cooperation letters

## OFFICE OF THE FEDERAL PUBLIC DEFENDER
## FOR THE NORTHERN DISTRICT OF NEW YORK

<u>Syracuse Office</u>

4 Clinton Square
3RD FLOOR
SYRACUSE, NY 13202
(315) 701-0080
(315) 701-0081 FAX



<u>Albany Office</u>

54 State St.
3RD FLOOR
ALBANY, NY 12207
(518) 436-1850
(518) 436-1780 FAX

August 4, 2023

Hon. Glenn T. Suddaby
United States District Judge
James M. Hanley Federal Building
100 S. Clinton Street
Syracuse, NY 13202

**RE:    United States v. Ramiro Loachamin
Case No.: 20-CR-46 (GTS)**

**<u>CONFIDENTIAL SUBMISSION- NOT TO BE FILED</u>**

Dear Judge Suddaby:

As you are aware, on November 19, 2020, Ramiro Loachamin entered a guilty plea to both counts contained in the indictment, and is scheduled to be sentenced on August 8, 2023. I am submitting this confidential submission in accordance with the local rules and in further support of a motion for downward departure of his sentence as requested in our sentencing memorandum. We ask this Court to consider Ramiro's cooperation with law enforcement in the hopes this Court will depart five (5) levels. We further ask this Court to sentence Ramiro to time-served. At the time of his sentencing, he will have served 14 months and 16 days, and is facing potential immigration proceedings at the conclusion of this case.

**Summary of cooperation**

Ramiro met and proffered with law enforcement agents and discussed in detail his involvement in the current offense, and the involvement of others. He provided names, phone numbers, and specific information about crimes being committed by other individuals he knew. As it related alien smuggling, he told agents about specific farms that he knew were involved, and provided detailed information about two other people involved. Specifically, he told agents that a man named Jose used to work on a farm in Malone, and he was helping people cross the border illegally from Canada. Another man named Miguel was doing the same thing. Ramiro explained that Jose had contacted him the night before the offense, and told him that he had 3 guys up at the border, and that something had happened, and one guy took off. He asked Ramiro

to pick the straggler up, to which Ramiro eventually agreed. Ramiro also provided information about individuals also incarcerated in the Clinton County Jail who were known to be involved in alien smuggling. He provided information about a man named Vladimir who was a coyote, and had recently crossed a polish man. Another man named Malik had crossed several people with the last name Patel. Ramiro told agents that Malin owns a limo company in New Jersey, and is involved with both crossing people and picking them up.

Ramiro showed agents the contact information he had for Miguel and Jose in his phone, using WhatsApp. He provided specific location details for farms involved. He further provided a phone number for a woman who he knew to produce fake documents, and a phone number for a woman who lives in Lowville and routinely picks people up at the border.

The agents expressed interest in the individuals who were producing fraudulent documents. Ramiro worked with the agents to cooperate proactively against these individuals. In doing so, he met with agents to formulate a plan to conduct controlled phone calls to certain targets who were suspected to be involved in creating fraudulent immigration documents, and eventually made the controlled calls. During the controlled calls he arranged to purchase fraudulent documents. He successfully purchased both a fraudulent driver's license and fraudulent legal permanent resident card from a target. He provided substantial assistance to law enforcement in their investigation of these individuals, and provided meaningful information which was able to be corroborated through his actions. He remains willing to cooperate if needed, and to testify if needed.

### Cooperating implicated his safety

Ramiro cooperated proactively while out of custody. He contacted people that he knew, and engaged them in conversations related to their criminal activity. He routinely had contact with individuals who were engaged in criminal activity, and used his own name and information to communicate with them. Doing so implicated his safety because these individuals were being investigated, and Ramiro was on the front-lines helping the investigation into people that he himself knew.

### Substantial assistance

Throughout the course of his cooperation, Ramiro has remained willing to provide information, to cooperate proactively, and to testify as needed. He has remained in contact with defense counsel about information he can provide, how he can cooperate proactively, and he has truthfully provided this information to law enforcement. Ramiro has provided substantial assistance to the government in the investigation of individuals known to law enforcement. He participated in proffers, cooperated proactively, and remained willing to provide whatever assistance was necessary. He provided truthful information which was found to be credible. The information he provided was used to investigate several other individuals. Ramiro provided a wealth of information about alien smuggling near the border and gave an enormous amount of details including the specific locations of farms involved, the names and contact information of others involved, and the names of the coyotes used to cross the people. He further provided significant information about individuals producing fraudulent documents, and cooperated

proactively against these individuals. He was successful in purchasing fraudulent documents on behalf of law enforcement.

Ramiro was truthful, forthcoming, and candid about his own involvement and the involvement of others. He did not attempt to protect anyone, nor did he minimize his own behavior. We ask that the Court consider Ramiro's cooperation as a mitigating factor in determining his sentence and imposing a sentence beneath the guideline range and statutory mandatory minimums. See U.S.S.G. §5K1.1 (commentary) and 18 U.S.C. §3553(e). We submit that a departure of five (5) levels is appropriate given the importance of the information he provided, the usefulness of his proactive cooperation, his role in the investigation of others, and his commitment to helping the government in their investigations into multiple other individuals.

Ramiro's offense level is 10, which when paired with his criminal history category III results in a guideline range of imprisonment of 10-16 months. However, because Ramiro is facing a 36-month mandatory minimum, his offense level becomes 17. A departure of five (5) levels would reduce his offense level to 12, which would result in a guideline range of imprisonment of 15-21 months. Ramiro has already served 14 months and 16 days.

Thank you for your consideration in this matter.

Respectfully,

OFFICE OF THE FEDERAL PUBLIC DEFENDER

By:     _s/Gabrielle DiBella_
        Assistant Federal Public Defender

cc:     AUSA Jeff Stitt, by email



**United States Department of Justice**

*United States Attorney*
*Northern District of New York*

| | |
|---|---|
| *445 Broadway, Room 218* | *Tel.: (518) 431-0247* |
| *James T. Foley U.S. Courthouse* | *Fax: (518) 431-0249* |
| *Albany, New York 12207-2924* | |

August 4, 2023

**CONFIDENTIAL NOT TO BE FILED**

Hon. Glenn T. Suddaby
U.S. District Judge
Federal Building and U.S. Courthouse
P.O. Box 7367
Syracuse, New York 13261-7367

Re:  **United States v. Ramiro Loachamin**
   **Case No. 8:20-CR-046 (GTS)**

Dear Judge Suddaby:

The purpose of this letter is to advise the Court of the nature and extent of the assistance that defendant Loachamin provided to law enforcement pursuant to an agreement between the defendant and the United States, and that the United States does intend to make a motion for a downward departure pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e) from the applicable Sentencing Guidelines range and statutory mandatory minimum sentence in this case at sentencing, currently scheduled for August 8, 2023 before your Honor in Albany, New York.

We are providing this information in an unfiled confidential letter, a copy of which is being provided to defense counsel, because public disclosure of this defendant's efforts to provide substantial assistance in the investigation or prosecution of one or more other persons who have committed offenses could jeopardize an ongoing federal criminal investigation by revealing the existence of that investigation to potential targets and subjects of the investigation.

The United States intends to move for a -2 departure for the following reasons:

The defendant proffered with law enforcement agents and described his previous involvement in alien smuggling and how he became involved in smuggling. The defendant made controlled phone calls to targets that he believed were producing fraudulent documents. The defendant successfully purchased a fraudulent driver's license and legal permanent residence card from a target in California. The defendant's assistance provided Homeland Security Investigations meaningful intelligence in identifying co-conspirators and their means and ability to produce fraudulent government documents.

Letter to Judge Suddaby, District Court Judge
United States v. Loachamin
Case No. 8:20-CR-046 (GTS)
August 4, 2023
Page 2

       Thus, it is the government's position that the defendant's total offense level is 10, and he is in criminal history category III, resulting in an advisory guidelines imprisonment range of 10 to 16 months. Because the defendant is subject to a mandatory minimum term of imprisonment of 36 months, under the guidelines, his imprisonment range becomes 36 months. With the government's anticipated departure motion under U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e), and applying *Richardson,* criminal history category III, offense level 17 calls for a guidelines sentence of 30-37 months. *See United States v. Richardson,* 521 F.3d 149 (2d. Cir. 2008). The government proposes a one-level departure from level 17 to level 15, which yields an advisory guidelines range of 24-30 months.

       Because of the above-stated concerns, and based on the policy of the Federal District Court for the Northern District of New York prohibiting "reference to or mention of any cooperation or assistance provided by the Defendant or the nature of any resulting downward departure motion" (as set out in "Waiver of Rule 11 Right to Open Court Discussion and Record of the Defendant's Cooperation or Assistance"), the government will avoid mention in open court of a government motion for departure at the defendant's sentencing. Accordingly, the government respectfully requests that the Court interpret the government's silence at sentencing as the equivalent of the government having made a departure motion consistent with the terms set out in this letter. If circumstances change between the time of this letter and sentencing that affect the government's intent to move for departure as stated here, the government will bring that change to the Court's attention. If the Court prefers that the government make a motion on the record rather than having to interpret the government's silence as a motion, the government asks that the Court provide the government an opportunity to make its motion in an in camera hearing that is not reflected in the transcript of the in-court sentencing hearing.

                              CARLA B. FREEDMAN
                              United States Attorney

            By:      /s Jeffrey C. Stitt
                    Jeffrey C. Stitt
                    Assistant United States Attorney
                    Bar Roll No. 520195

cc:    Gabrielle DiBella, Esq.
       Craig Penet, Senior U.S. Probation Officer

                     **CONFIDENTIAL NOT TO BE FILED**

# ATTACHMENT "E"

# United States Court for the Western District of New York - Buffalo and Rochester Division both recently granted multiple procedural due process challenges

**Gutierrez v. Barr,** NO. 20-CV-6199-FPG, 2020 U.S. Dist. LEXIS 109917" finding that this length of time was "beyond the point at which courts find detention unreasonably prolonged". See also **"Ramos v. Barr,** No. 20-CV-371-FPG, 2020 U.S. Dist. LEXIS 126905". See also **Gutierrez v. Barr,** No. 20-CV-6078-FPG, 2020 U.S. Dist. LEXIS 74895,2020 WL 20598456, at *2 ; **Salad v. Dep't of Corr.,** 769 F. Supp. 3d 913, 2025 U.S. Dist. LEXIS 41117, 2025 LX 115113, 2025 WL 732305 (Dist. Alaska March 7, 2025)

 LexisNexis®

**Date and Time:** Tuesday, September 16, 2025 9:35☐ AM EDT
**Job Number:** 262863358

## Document (1)

1. _Gutierrez v. Barr, 2020 U.S. Dist. LEXIS 109917_
   **Client/Matter:** -None-
   **Search Terms:** 20-CV-6199-FPG
   **Search Type:** Natural Language
   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | Sources: All Immigration |

March 5, 2020. At the conclusion of the hearing, the IJ denied his applications for relief from removal and ordered him removed. His appeal to the Board of Immigration Appeals ("BIA") remains pending.

Gutierrez commenced this proceeding by filing a Petition on March 27, 2020. ECF No. 1. The Government filed a Response, ECF No. 3, with Exhibits, ECF Nos. 3-1 - 3-5, and a Memorandum of Law, ECF No. 4. Gutierrez filed a Declaration, ECF No. 5, and a Reply, ECF No. 6.

## DISCUSSION

### I. Statutory Basis for Petitioner's Detention

Gutierrez cites *8 U.S.C. § 1231(a)* ("*§ 1231(a)*") as the statutory basis for his detention. However, this is incorrect; Gutierrez is still in removal proceedings and does not have an administratively final order of removal.

The Government asserts that Gutierrez is detained under *8 U.S.C. § 1226(c)* ("*§ 1226(c)*"). *See* ECF No. 4 at 4 & n.1. The Court agrees. Under *§ 1226(c)(1)*, the Government must detain any alien who

> (A) is inadmissible by reason of having committed any offense covered in *section 1182(a)(2)* of this title,
>
> (B) is deportable by reason of having committed any offense covered in *section 1227(a)(2)(A)(ii)*, *(A)(iii)*, *(B)*, *(C)*, or *(D)* of this title,
>
> (C) is deportable under *section 1227(a)(2)(A)(i)* of this title on the basis of an offense for which the alien has been sentenced to a term of imprisonment [*4] of at least 1 year, or
>
> (D) is inadmissible under *section 1182(a)(3)(B)* of this title or deportable under *section 1227(a)(4)(B)* of this title. . . .

*8 U.S.C. § 1226(c)(1)*. The NTA charged Gutierrez with being subject to removal pursuant to *8 U.S.C. § 1227(a)(2)(A)(iii)* and *1227(a)(2)(B)(i)*. *See* ECF No. 3-2 at 13. Gutierrez is therefore within the class of aliens described in *§ 1226(c)(1)(B)*.

### II. Merits of the Petition

In Count One, Gutierrez alleges that his continued detention violates *§ 1231(a)(6)* as a statutory matter because the presumptively reasonable six-month period for removal efforts has expired. *See* ECF No. ¶ 21. Count Two asserts that Gutierrez is subject to "indefinite" detention in violation of his substantive due process rights under the *Fifth Amendment*. *See id.* ¶ 24. Finally, in Count Three, Gutierrez contends that "[t]he failure of Respondents to provide a neutral decisionmaker to review the continued custody of Petitioner violates Petitioner's right to procedural due process." *Id.* ¶ 27.

Because Gutierrez is unrepresented, the Court must construe his pleadings leniently. *E.g.*, *Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007)* (per curiam). The Court accordingly interprets the three Counts as raising the same legal theories as articulated in the Petition, but in the context of detention authorized pursuant to *§ 1226(c)*, rather than *§ 1231(a)*. As discussed further below, the Court [*5] finds that Count Three, which asserts a procedural due process violation, warrants habeas relief. Accordingly, it need not consider Counts One and Two. *See, e.g.*, *Hassoun v. Sessions, No. 18-CV-586-FPG, 2019 U.S. Dist. LEXIS 451, 2019 WL 78984, at *7 (W.D.N.Y. Jan. 2, 2019)* (because petitioner had been "afforded complete relief by virtue of his first claim," it was "unnecessary to address [his] alternative grounds [for relief]") (citing *Banks v. Dretke, 540 U.S. 668, 689 n.10, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004)* (where writ of habeas corpus was granted on one basis, declining to address alternative ground because "any relief [the petitioner] could obtain on that claim would be cumulative"); other citation omitted).

While *§ 1226(c)* is facially constitutional and authorizes Gutierrez's detention as a statutory matter, *see Jennings v. Rodriguez, 138 S. Ct. 830, 846, 200 L. Ed. 2d 122 (2018)*, his "continuing detention must also be consistent with substantive and procedural due process principles as they are applied to him." *Joseph v. Decker, No. 18-CV-2640(RA), 2018 U.S. Dist. LEXIS 198781, 2018 WL 6075067, at *9 (S.D.N.Y. Nov. 21, 2018)* (citing *Martinez v. Decker, No. 18-CV-6527 (JMF), 2018 U.S. Dist. LEXIS 178577, 2018 WL 5023946, at *4 (S.D.N.Y. Oct. 17, 2018)*, *appeal withdrawn*, No. 19-245, 2019 WL 3334802 (2d Cir. May 1, 2019). Courts in this District generally have "evaluated procedural due process challenges to immigration detention with a two-step inquiry." *Hemans v. Searls, No. 18-CV-1154, 2019 U.S. Dist. LEXIS 31353, 2019 WL 955353, at *5 (W.D.N.Y. Feb. 27, 2019)*. "As the first step, the Court

2020 U.S. Dist. LEXIS 109917, *9

the "'majority view in the Second Circuit [which] requires the 'immediate custodian,' generally the prison warden, to be named as a respondent in "core" immigration habeas proceedings—i.e., those challenging present physical confinement.'" *Hassoun, 2019 U.S. Dist. LEXIS 451, 2019 WL 78984, at *7* (quoting *Khemlal v. Shanahan, No. 14 Civ. 5186, 2014 U.S. Dist. LEXIS 143445, 2014 WL 5020596, at *2 n.3 (S.D.N.Y. Oct. 8, 2014))* (citation omitted). Therefore, the other respondents will be dismissed from the case, and the Court's order will be limited to Respondent Searls. *Id.* (citing *Fed. R. Civ. P. 21* ("On motion or on its own, the court may at any time, on just terms, add or drop a party.")).

**CONCLUSION**

For the foregoing reasons, the Petition is GRANTED IN PART and DENIED IN PART.

The Petition is GRANTED to the extent that Respondent Searls is directed to bring Gutierrez before an immigration judge for a bond hearing within fourteen (14) days of the date of this Decision and Order. At the bond hearing, Respondent Searls shall bear the burden of proving by clear and convincing evidence that Gutierrez's continued detention is justified on the basis that he is a flight risk or a danger **[*10]** to the community. The immigration judge also must consider whether less restrictive alternatives to detention would ameliorate those concerns. Respondent Searls shall release Gutierrez unless the immigration judge finds by clear and convincing evidence that no condition or combination of conditions of release will reasonably assure Gutierrez's appearance at future immigration proceedings and the safety of the community or any persons. If a bond hearing is not held within fourteen (14) days of the date of this Decision and Order, Respondent Searls shall release Gutierrez immediately with appropriate conditions of supervision. Within five (5) days of bond hearing, Respondent Searls shall file a notice with this Court certifying either (1) that a bond hearing was held by the deadline, and the outcome thereof, or (2) that no bond hearing was held, and that Gutierrez was released with appropriate conditions of supervision.

The Petition is DENIED as to the claims based on *§ 1231*, as they are premature. Accordingly, the claims based on *§ 1231* are DISMISSED WITHOUT PREJUDICE.

The Clerk of Court is directed to enter judgment and close this case.

IT IS SO ORDERED.

Dated: June 22, 2020

Rochester, New York

/s/ **[*11]** Frank P. Geraci, Jr.

HON. FRANK P. GERACI, JR.

Chief Judge

United States District Court

---

**End of Document**

 LexisNexis·

**Date and Time:** Tuesday, September 16, 2025 9:39☐ AM EDT
**Job Number:** 262863746

## Document (1)

1. _Ramos v. Barr, 2020 U.S. Dist. LEXIS 126905_
   **Client/Matter:** -None-
   **Search Terms:** 2020 U.S. Dist. LEXIS 126905
   **Search Type:** Natural Language
   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | Sources: All Immigration |

to Appear," charging that he was subject to removal from the United States under various provisions of the *Immigration and Nationality Act ("INA")*, *8 U.S.C. §§ 1101-1537*. Docket Item 6-2 at 5-7. More specifically, DHS charged that Ramos was subject to removal under *section 1227(a)(2)(B)(i)* for having been convicted of a controlled-substances offense and *sections 1227(a)(2)(A)(iii)* and *1101(a)(43)(B)* for having been convicted of an aggravated felony, namely illicit trafficking in a controlled substance. Docket Item 6-2 at 6. Ramos was released on a $10,000 bond. *Id.* at 8.

On October 24, 2018, Ramos was convicted in Supreme Court, New York County, of criminal possession of a [*3] controlled substance in the third degree. *Id.* at 9.[3]

On May 9, 2019, DHS amended the Notice to Appear, charging that Ramos was subject to removal under an additional provision of the INA—that is, *section 1227(a)(2)(A)(ii)*—for having been convicted of at least two crimes of moral turpitude at any time after his admission. *Id.* at 19-20.

On June 19, 2019, ICE took Ramos into custody. Docket Item 6-1 at 3. DHS determined two days later that Ramos would remain in detention pending removal. Docket Item 6-2 at 24.

On November 18, 2019, an Immigration Judge ("IJ") denied Ramos's applications for relief from removal and ordered him removed to the Dominican Republic. *Id.* at 25-34. Ramos had begun those applications in September 2012, but the proceedings were "continued fifteen times due to a variety of reasons," including Ramos's efforts to secure counsel, changing of IJs over the years, one IJ's request for supplemental briefing, DHS's amendment of its charges, and a venue change after Ramos was transferred to BFDF. *Id.* at 26-27.

---

[3] A New York City Pre-Sentence Investigation Face Sheet indicates that Ramos also was arrested on August 20, 2012, for uttering false statements in using a passport and for failing to appear. *Id.* at 13. The Face Sheet indicates that the "[d]ispositions are unknown in th[o]se cases." *Id.* A separate DHS document, titled a "Record of Deportable/Inadmissible Alien," indicates that Ramos was arrested on September 22, 2011, for those same offenses and convicted on August 20, 2012. *Id.* at 21-22. Because the respondents have not produced any conclusive evidence of these convictions, but instead rely only on documents that obliquely reference them, the Court will not consider them in its disposition of this matter. In any event, neither alleged conviction appears to have been material to Ramos's immigration proceedings.

Ramos appealed the IJ's decision to the Board of Immigration Appeals ("BIA"), which denied the appeal on May 14, 2020. *Id.* at 40-43. The respondents represented that Ramos had neither petitioned the United States Court of Appeals for the Second [*4] Circuit to review that denial, nor moved that court to stay his removal. *See* Docket Item 6-1 at 3. But in his reply, Ramos asserted that he indeed had taken these steps. Docket Item 11 at 3. A review of the Second Circuit docket confirms that Ramos, acting *pro se*, both petitioned for review and moved to stay his removal. *See Ramos v. Barr*, No. 20-1696, Docket Items 1 and 3 (2d Cir. May 29, 2020). Those motions remain pending. *See id.*

## DISCUSSION

### I. HABEAS PETITION

*28 U.S.C. § 2241* "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the laws or treaties of the United States.'" *Wang v. Ashcroft, 320 F.3d 130, 140 (2d Cir. 2003)* (quoting *28 U.S.C. § 2241(c)(3)*). The government maintains that Ramos is validly detained under *8 U.S.C. § 1231(a)* as a noncitizen subject to a final order of removal. Docket Item 6 at 1.

Ramos disagrees on three grounds. First, he contends that his detention for over six months is "unlawful and contravenes *8 U.S.C. § 1231(a)(6)* as interpreted by the Supreme Court in *Zadvydas [v. Davis, 533 U.S. 678, 701, 121 S. Ct. 2491, 150 L. Ed. 2d 653 (2001)]*." Docket Item 1 at 21-22. The Court construes Ramos's first claim as arguing that his continued detention violates *8 U.S.C. § 1231(a)(6)* because there is "good reason to believe that there is no significant likelihood of [his] removal in the reasonably foreseeable future." [*5] [4] *See Zadvydas, 533 U.S. at 701*. Second, Ramos argues that his detention violates his right to substantive due process under the *Fifth Amendment of the United States Constitution*. *Id.* at 22. And third, he argues that his "prolonged detention has not been accompanied by the kind of procedural protections that such a significant deprivation of liberty requires" and

---

[4] Because Ramos is proceeding *pro se*, this Court holds his submissions "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)*.

2020 U.S. Dist. LEXIS 126905, *8

special, and narrow circumstances, "[o]nly a jury, acting on proof beyond a reasonable doubt, may take a person's liberty. That promise stands as one of the Constitution's most vital protections against arbitrary government." _United States v. Haymond, 139 S. Ct. 2369, 2373, 204 L. Ed. 2d 897 (2019)._

"[Noncitizens], even [noncitizens] whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the _Fifth . . . Amendment[_ ]." _Plyler v. Doe, 457 U.S. 202, 210, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982); see also Shaughnessey v. United States ex rel. Mezei, 345 U.S. 206, 212, 73 S. Ct. 625, 97 L. Ed. 956 (1954)_ ("It is true that [noncitizens] who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law."). At the same time, Congress has "broad power over naturalization and immigration, [permitting [*9] it to] make[ ] rules that would be unacceptable if applied to citizens." _Demore v. Kim, 538 U.S. 510, 521, 123 S. Ct. 1708, 155 L. Ed. 2d 724 (2003)_ (quoting _Mathews v. Diaz, 426 U.S. 67, 79-80, 96 S. Ct. 1883, 48 L. Ed. 2d 478 (1976))._

## A. Substantive Due Process

Ramos argues that his detention violates his right to substantive due process. Docket Item 1 at 22. He has been in DHS custody since June 18, 2019—nearly 13 months. Docket Item 6-1 at 3. But this Court cannot say that detention that long violates due process. See _Sanusi v. I.N.S., 100 F. App'x 49, 51 (2d Cir. 2004)_ (summary order) (determining that six-year detention did not violate due process). Indeed, detention under _section 1226_ may serve the government's compelling interests in both "preserv[ing] the government's ability to later carry out its broader responsibilities over immigration matters," _Doherty v. Thornburgh, 943 F.2d 204, 211 (2d Cir. 1991)_, and preventing crime by arrestees who pose a danger to the safety of the community, see _Salerno, 481 U.S. at 749_. Although there comes a time when the length of a noncitizen's detention pending removal violates due process regardless of the procedural protections afforded, see _Salerno, 481 U.S. at 747 n.4_, that time has not yet come here.

## B. Procedural Due Process

Ramos also argues that his detention violates his right to procedural due process. Docket Item 1 at 23-31.[5] The _Due Process Clause_ is not offended by the mandatory detention of noncitizens for the "_brief period necessary_ for their removal proceedings," [*10] _Demore, 538 U.S. at 513_ (emphasis added), but may be violated by detention beyond that "brief" period, depending on the balance of the individual's and the government's interests, see, e.g., _id. at 532_ (Kennedy, J., concurring) ("[A] lawful permanent resident . . . could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention bec[omes] unreasonable or unjustified."); see also _Landon v. Plasencia, 459 U.S. 21, 34, 103 S. Ct. 321, 74 L. Ed. 2d 21 (1982)_ ("The constitutional sufficiency of procedures provided in any situation, of course, varies with the circumstances.").

For that reason, this Court "has evaluated procedural due process challenges to immigration detention with a two-step inquiry," _Hemans, 2019 U.S. Dist. LEXIS 31353, 2019 WL 955353, at *5_. "A[t] the first step, the Court considers whether the [noncitizen's] detention has

---

[5] To the extent Ramos contends that his "substantial challenges to deportability," Docket Item 1 at 19, mean that he is not "deportable by reason of having committed" certain designated offenses, _8 U.S.C. § 1226(c)_, the Court denies that grounds for relief. The Supreme Court did leave open the merits of such an argument. See _Demore, 538 U.S. at 522 & n.6_ (declining to reach the petitioner's argument that "he might not be subject to detention under _[section] 1226(c)_ after all because his 1997 conviction for petty theft with priors might not qualify as an aggravated felony" due to the fact that the petitioner had "conceded that he [was] deportable for purposes of his habeas corpus challenge to _[section] 1226(c)_ at all previous stages of this proceeding"). But Ramos did not specify the nature of this alleged "substantial challenge," and the only grounds apparent from his petition is cancellation of removal. See Docket Item 1 at 19. The Court finds no indication that he has challenged whether, for example, any of his prior convictions qualify as aggravated felonies. And an application for cancellation of removal is not a challenge to removability, but rather a request for discretionary relief. See, e.g., _De La Vega v. Gonzales, 436 F.3d 141, 143-146 (2d Cir. 2006)_. "[T]he Supreme Court's decision in _Demore_ all but forecloses the argument that the term 'is deportable,' as used in _[section] 1226(c)_, means anything other than an alien who _prima facie_ qualifies for removal, regardless of whatever forms of discretionary relief may be available, as well as the argument that applying the mandatory detention statute to an alien who may qualify for discretionary relief is unconstitutional." _Young v. Aviles, 99 F. Supp. 3d 443, 454 (S.D.N.Y. 2015)_ (citation omitted).

2020 U.S. Dist. LEXIS 126905, *13

Because of the cells, restraints, and discipline in the SHU, conditions at BFDF certainly "resemble penal confinement" for at least some persons detained there. _Muse, 409 F. Supp. 3d 707, 2018 WL 4466052, at *5._ And while the record contains no facts about the particular conditions of Ramos's confinement, he may well have been locked in a cell because, as the government repeatedly highlights, he has a criminal history. So the government has not shown that Ramos's detention is "meaningfully different from [detention in] [*14] a penal institution." _Sajous, 2018 U.S. Dist. LEXIS 86921, 2018 WL 2357266, at *11._ This factor therefore weighs in Ramos's favor as well.

Third, courts consider whether the detainee has prolonged his own detention. The Second Circuit has found that this factor weighs against finding detention unreasonable when a noncitizen has "substantially prolonged his stay by abusing the processes provided to him" but not when "an immigrant . . . [has] simply made use of the statutorily permitted appeals process." _Hechavarria, 891 F.3d at 56 n.6_ (first quoting _Nken v. Holder, 556 U.S. 418, 436, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009))._ As the Sixth Circuit has noted, "appeals and petitions for relief are to be expected as a natural part of the process. A [noncitizen] who would not normally be subject to indefinite detention cannot be so detained merely because he seeks to explore avenues of relief that the law makes available to him." _Ly v. Hansen, 351 F.3d 263, 272 (6th Cir. 2003)_ (cited in _Hechavarria, 891 F.3d at 56 n.6)._ Indeed,

> although a [noncitizen] may be responsible for seeking relief, he is not responsible for the amount of time that such determinations may take. The mere fact that a [noncitizen] has sought relief from deportation does not authorize the [government] to drag its heels indefinitely in making a decision. The entire process, not merely the original deportation hearing, is subject to the constitutional requirement [*15] of reasonableness.

_Id._

Here, DHS charged Ramos with removability on August 21, 2012, Docket Item 6-2 at 5-7, and Ramos promptly applied for relief from removal, _see id._ at 26-27. The proceedings were "continued fifteen times due to a variety of reasons," including Ramos's efforts to secure counsel, changing of IJs over the years, one IJ's request for supplemental briefing, DHS's amendment of its charges, and a venue change after Ramos was transferred to BFDF. _Id._ at 26-27. Focusing more

narrowly on the time since Ramos was taken into custody in June 2019, the proceedings have been continued to change venue, to afford Ramos time to secure new counsel, and so that Ramos's new counsel could brief the IJ on certain issues. _Id._ at 27. The IJ denied Ramos's applications shortly after she heard argument in November 2019, but the BIA did not affirm that decision until May 2020. _Id._ at 27, 34, 40-43. Ramos then promptly petitioned the Second Circuit for review. _See Ramos v. Barr,_ No. 20-1696, Docket Items 1 and 3 (2d Cir. May 29, 2020).

Although Ramos has caused some of the delay in his removal, he has not "abus[ed] the processes provided to him." _See Hechavarria, 891 F.3d at 56 n.6_ (quoting _Nken, 556 U.S. at 436)._ That is particularly true in the time period since he was detained. He has requested [*16] continuances to secure counsel—at times requests prompted by the respondent's decisions to relocate him; otherwise, he has done nothing more than challenge his removal and appeal the IJ's decision to the BIA and then to the Second Circuit. The government decision makers, in contrast, collectively are responsible for at least eight months of delay since taking Ramos into custody. Therefore, the third factor weighs in Ramos's favor.

Finally, courts consider the likelihood that the removal proceedings will result in a final order of removal. This Court declines to weigh the merits of Ramos's claims pending before the Second Circuit.

After balancing all these factors, this Court finds that Ramos's detention has been unreasonably prolonged. Therefore, this Court turns to the second step of the two-part inquiry to determine what remedy his unreasonably-prolonged detention demands.

**2. The Process Due to Ramos**

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" _Mathews, 424 U.S. at 333_ (quoting _Armstrong v. Manzo, 380 U.S. 545, 552, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965))._ "[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors," _id. at 335,_ namely: "(A) the private interest [*17] affected; (B) the risk of erroneous deprivation of that interest through the procedures used; and (C) the governmental interest at stake." _Nelson v. Colorado, 137 S. Ct. 1249, 1255, 197 L. Ed. 2d 611 (2017)._ Here, that analysis leads to the

_Addington, 441 U.S. at 424_)). That standard applies equally here.

To sustain the prolonged detention of a noncitizen subject to removal proceedings based on its general interests in immigration detention, the "[g]overnment [is] required, in a 'full-blown adversary hearing,' to convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person," _Foucha, 504 U.S. at 81_ (quoting _Salerno, 481 U.S. at 751_), or ensure that the noncitizen will appear for any future proceeding.[9] This requires consideration of less restrictive alternatives to detention. _See id._; cf. _United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 816, 120 S. Ct. 1878, 146 L. Ed. 2d 865 (2000)_ ("When a plausible, less restrictive alternative is offered to a" regulation burdening a constitutional right, "it is the Government's obligation to prove that the alternative will be ineffective [*21] to achieve its goals.").

Ramos's _section 1226(c)_ detention has been unreasonably prolonged. Because _section 1226(c)_ does not require an individualized hearing in which the government must demonstrate by clear and convincing evidence that no conditions of release can reasonably serve the government's compelling regulatory interests in detaining him, it is unconstitutional as applied to him. As such, his continued detention violates the _Due Process Clause_.

Ramos must be released unless, no later than **14 calendar days from the date of this decision and order**, the government demonstrates by clear and convincing evidence before a neutral decision maker that Ramos's continued detention is necessary to serve a compelling regulatory purpose—such as preventing flight or protecting others or the community. The decision maker also must consider—and must address in any decision—whether there is clear and convincing evidence that there are no less-restrictive alternatives to physical detention, including release on bond in an amount the petitioner can reasonably afford, with or without conditions, that also would reasonably address those same regulatory purposes.

---

[9] As this Court explained in _Hemans, 2019 U.S. Dist. LEXIS 31353, 2019 WL 955353, at *8 n.7_, a pretrial detainee's right to a speedy trial distinguishes the interests supporting the evidentiary standard traditionally applicable to flight-risk determinations for pretrial detention purposes from what is required after an unreasonably-prolonged immigration detention.

## IV. LIMIT ON TRANSFERRING RAMOS

Ramos also has asked this Court to order the respondents [*22] and their "agents not to remove [him] from the jurisdiction of this Court during the duration of the consideration of this petition." Docket Item 11 at 7.

Now that this Court has conditionally granted Ramos's writ, his jurisdictional concerns are not unreasonable. After all, "conditional writs 'would be meaningless' if a habeas court could not determine compliance with them and order sanctions accordingly." _Mason v. Mitchell, 729 F.3d 545, 549 (6th Cir. 2013)_ (quoting _Satterlee v. Wolfenbarger, 453 F.3d 362, 368 n.5 (6th Cir. 2006))_. But "[it] is well established that jurisdiction attaches on the initial filing for habeas corpus relief, and it is not destroyed by a transfer of the petitioner and the accompanying custodial change." _See Santillanes v. U.S. Parole Comm'n, 754 F.2d 887, 888 (10th Cir. 1985)_. In other words, regardless of where Ramos is housed, this Court retains jurisdiction over his habeas petition. So there is no need to interfere with DHS's authority to "arrange for appropriate places of detention" under _8 U.S.C. § 1231(g)(1)_.

## ORDER

In light of the above, IT IS HEREBY

ORDERED that **within 14 calendar days of the date of this decision and order**, the government must release Ramos from detention unless a neutral decision-maker conducts an individualized hearing to determine whether his continued detention is justified; and it is further

ORDERED that at any such hearing, the government [*23] has the burden of demonstrating by clear and convincing evidence that Ramos's continued detention is necessary to serve a compelling regulatory purpose, such as minimizing risk of flight or danger to the community. Whether detention is necessary to serve a compelling regulatory purpose requires consideration of whether a less-restrictive alternative to detention would also address the government's interests. In other words, the decision maker must find that no condition or combination of conditions of release can reasonably ensure Ramos's appearance and the safety of the community—that is, even with conditions, Ramos presents an identified and articulable risk of flight or a threat to an individual or the community; and it is further

 **LexisNexis**

**Date and Time:** Tuesday, September 16, 2025 9:43⬜AM EDT
**Job Number:** 262864179

## Document (1)

1. _Gutierrez v. Barr, 2020 U.S. Dist. LEXIS 74895_
   **Client/Matter:** -None-
   **Search Terms:** 20-CV-6078-FPG
   **Search Type:** Natural Language
   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | Sources: All Immigration |



2020 U.S. Dist. LEXIS 74895, *3

risk of flight or dangerousness.[1] ECF No. 1 at 9. The Court agrees.

In several provisions, the *Immigration and Nationality Act ("INA")* authorizes the detention of aliens pending removal. Relevant here is *8 U.S.C. § 1226*, which gives immigration officials the authority to arrest and detain an alien "pending a decision on whether the alien is to be removed from the United States." *8 U.S.C. § 1226(a)*. In other words, "*section 1226* governs the detention of immigrants who are not immediately deportable." *Hechavarria v. Sessions, 891 F.3d 49, 57 (2d Cir. 2018)*. This includes aliens, like Petitioner, whose administrative removal proceedings are ongoing. *See id.* While *Section 1226(a)* permits immigration authorities to release aliens pending the completion of removal proceedings, *Jennings v. Rodriguez, 138 S. Ct. 830, 837, 200 L. Ed. 2d 122 (2018)*, immigration authorities require the alien, not the government, to prove that release is justified, *i.e.*, that he is not a risk of flight or danger to the community. *See Hemans v. Searls, No. 18-CV-1154, 2019 U.S. Dist. LEXIS 31353, 2019 WL 955353, at *9 (W.D.N.Y. Feb. 27, 2019); Darko v. Sessions, 342 F. Supp. 3d 429, 433 (S.D.N.Y. 2018)*.

The question is whether this scheme is constitutional as applied to Petitioner. To determine whether an alien's due process rights have been violated as a result of his continued detention under *Section 1226*, the Court first evaluates whether [*4] the "alien [has been] held for an unreasonably long period." *Frederick v. Feeley, No. 19-CV-6090, 2019 U.S. Dist. LEXIS 74266, 2019 WL 1959485, at *2 (W.D.N.Y. May 2, 2019)* (discussing in context of detention under *8 U.S.C. § 1226(c)*); *see also Hemans, 2019 U.S. Dist. LEXIS 31353, 2019 WL 955353, at *5*. If the alien has been detained for an unreasonably long period, the Court proceeds to analyze whether the alien has received sufficient process to justify his continued detention. *Hemans, 2019 U.S. Dist. LEXIS 31353, 2019 WL 955353, at *5*.

Applying this framework, the Court concludes that Petitioner is entitled to relief.

First, Petitioner's detention has been unreasonably prolonged. He has been detained for over thirteen months. This is beyond the point at which courts find detention unreasonably prolonged. *See, e.g., Fremont v. Barr, No. 18-CV-1128, 2019 U.S. Dist. LEXIS 57296, 2019 WL 1471006, at *4 (W.D.N.Y. Apr. 3, 2019)* (collecting cases and noting that, after twelve months, courts "become extremely wary of permitting continued custody absent a bond hearing"); *Navarijo-Orantes v. Barr, No. 19-CV-790, 2019 U.S. Dist. LEXIS 192856, 2019 WL 5784939, at *4 (W.D.N.Y. Nov. 6, 2019)*. Granted, while before the immigration judge, Petitioner received several continuances resulting in an approximately three-month delay to his merits hearing.[2] But even if the Court were to count that delay against Petitioner, he would still have been detained for over ten months. *See Rasel v. Barr, No. 19-CV-1603, 2020 U.S. Dist. LEXIS 68041, 2020 WL 1905243, at *5 n.6 (W.D.N.Y. Apr. 17, 2020)* (collecting cases where courts found detention lasting nine months unreasonably prolonged). Thus, the length of detention militates in Petitioner's favor, particularly because he is still [*5] in the administrative phase of his removal proceedings. *See Sigal v. Searls, No. 18-CV-389, 2018 U.S. Dist. LEXIS 190760, 2018 WL 5831326, at *7 (W.D.N.Y. Nov. 7, 2018)* (noting that courts are more likely to find lengthy detention unreasonable if the petitioner is "still in the early stages of [his] immigration proceedings").

Respondents counter that, prior to his detention, Petitioner was at fault for various delays in his removal proceedings, which have been pending since 2011. *See* ECF No. 5 at 12. The Court fails to see, however, how that bears on the issue of whether Petitioner's *detention* has been unreasonably prolonged. That is, Respondents fail to explain how the length of Petitioner's detention is attributable to any pre-detention delays Petitioner caused.

In addition, Respondents assert that Petitioner has not shown that his appeal to the BIA is meritorious. *Id.* at 12-13. The Court does not find that argument persuasive. The Second Circuit has made a distinction between aliens who have "substantially prolonged [their] stay by abusing the processes provided to [them]" and those who have "simply made use of the statutorily permitted appeals process." *Hechavarria v. Sessions, 891 F.3d 49, 56 n.6 (2d Cir. 2018)*. Thus, Petitioner has a right to use the processes available to him, and unless

---

[1] Petitioner also raises other grounds, but the Court need not address them in light of its disposition of this claim. *See* ECF No. 1 at 9.

[2] Petitioner received several continuances that moved his May 6, 2019 hearing to August 15, 2019. *See* ECF No. 4-5 at 184, 193. Ultimately, the merits hearing was not held until November 18, 2019, but the record does not disclose why. Absent more information, the Court will not count the period between August and November 2019 against Petitioner.

 LexisNexis

**Date and Time:** Friday, September 19, 2025 10:48☐ AM EDT
**Job Number:** 263215245

## Document (1)

1. _Ahmed v. Freden, 744 F. Supp. 3d 259_
   **Client/Matter:** -None-
   **Search Terms:** 744 F. Supp. 3d 259
   **Search Type:** Natural Language
   **Narrowed by:**

|  |  |
|---|---|
| **Content Type** | **Narrowed by** |
| Cases | Sources: All Immigration |

744 F. Supp. 3d 259, *263; 2024 U.S. Dist. LEXIS 142107, **2

hands, and beat him to death with a metal pipe. (*Id.*; Dkt. 4-2 at 5). Petitioner and his cousin then moved the victim's body and disposed of the scarf and metal [**3] pipe. (*Id.*). The victim's cause of death was ruled a homicide. (*Id.*). Petitioner was convicted of manslaughter in the 1st degree in New York Supreme Court, Queens County and sentenced to 21 years in prison, and the Second Department affirmed his sentence. (Dkt. 4-1 at ¶¶ 8-9).

The Department of Homeland Security ("DHS") issued a Warrant of Removal/Deportation to Petitioner on March 2, 2009. (*Id.* at ¶ 10). DHS also issued an immigration detainer to Green Haven Correctional Facility so that DHS would be notified before Petitioner was to be released from New York State custody. (*Id.* at ¶ 11). On December 21, 2009, Immigrations and Customs Enforcement ("ICE") encountered Petitioner while he was in state custody and served him with a Notice to Appear. (*Id.* at ¶¶ 13-14). Petitioner was alleged to be subject to removal pursuant to *Section 237(a)(2)(A)(i)* and (iii) of the Immigration and Nationality Act, *8 U.S.C. § 1227(a)(2)(A)(i)* and *(iii)*, and an Immigration Judge ordered him removed to Pakistan on January 8, 2010. (*Id.* at ¶¶ 14-15).

ICE arrested and detained Petitioner at BFDF upon his release from state custody on April 13, 2023. (*Id.* at ¶ 16). The next day, DHS issued a Warrant of Removal/Deportation to Petitioner and requested travel documents for Petitioner from the Government of [**4] Pakistan. (*Id.* at ¶¶ 17-18). On July 13, 2023, ICE issued a Decision to Continue Detention to Petitioner, which explained that Petitioner would be detained until his removal from the United States because Petitioner had not demonstrated that he would not pose a danger to the community or a significant flight risk if released, pending his removal. (*Id.* at ¶ 20; Dkt. 4-2 at 21). Since requesting travel documents from the Government of Pakistan in April 2023, ICE has been "regularly following-up with the Consulate every few weeks." (Dkt. 4-1 at ¶ 21).

Petitioner has provided information to DHS to facilitate his removal, including a copy of his birth certificate and documents related to his immigration status in the United States, and he filled out travel documents when he arrived at BFDF. (Dkt. 1 at ¶ 24). He participated in an in-person interview with an official from the Pakistani Consulate on August 11, 2023, and he was told by his "deportation officer" that the Consulate normally issues travel documents within one month after an interview. (*Id.*). Petitioner communicated with the Pakistani

Embassy via phone on March 20, March 27, April 4, and May 2, 2024, about his travel documents, [**5] and each time, he was told that his request was in process but that an estimated date of completion was unavailable. (Dkt. 8-1 at ¶ 2). On April 15, 2024, ICE issued Petitioner another Decision to Continue Detention, which stated that ICE had "reason to believe there's a significant likelihood that your removal will occur in the reasonably foreseeable future," and, accordingly, that Petitioner would remain detained. (Dkt. 8-2).

## II. Procedural Background

Petitioner, who at the time was proceeding *pro se*, commenced this action on October 12, 2023. (Dkt. 1). Respondent filed a [*264] response in opposition. (Dkt. 4). Following the appearance of counsel on Petitioner's behalf (Dkt. 5; Dkt. 6), Petitioner filed a reply (Dkt. 7). Petitioner thereafter filed a notice advising the Court of Petitioner's communications with Pakistani officials regarding his travel documents and that ICE had issued another Decision to Continue Detention on April 15, 2024. (Dkt. 8).

## DISCUSSION

## I. Jurisdiction

The federal habeas corpus statute gives district courts jurisdiction to hear immigration-related detention cases. *See 28 U.S.C. § 2241(c)(3)*; *Zadvydas v. Davis, 533 U.S. 678, 688, 121 S. Ct. 2491, 150 L. Ed. 2d 653 (2001)* (holding that "*§ 2241* habeas corpus proceedings remain available as a forum for statutory and constitutional [**6] challenges to post-removal-period detention" in immigration cases). District courts do not have jurisdiction over challenges to the legality of final orders of deportation, exclusion, and removal; jurisdiction to review such challenges rests exclusively in circuit courts. *See Gittens v. Menifee, 428 F.3d 382, 384 (2d Cir. 2005)* ("[The *REAL ID Act, 119 Stat. 231, § 106(a) (May 11, 2005)*] eliminates habeas jurisdiction over final orders of deportation, exclusion, and removal, providing instead for petitions of review . . . which circuit courts alone can consider."). Respondent does "not dispute that this Court has subject matter jurisdiction over Petitioner's challenge to his continued detention in custody." (Dkt. 4 at ¶ 1).

744 F. Supp. 3d 259, *265; 2024 U.S. Dist. LEXIS 142107, **9

detainee] than they were once they first took him into custody" is sufficient to satisfy Petitioner's initial burden. _Singh v. Whittaker, 362 F. Supp. 3d 93, 102-03 (W.D.N.Y. 2019)_, appeal withdrawn, _No. 19-729, 2019 U.S. App. LEXIS 19151, 2019 WL 2590582 (2d Cir. May 1, 2019)_. "Good reason to believe does not place a burden upon the detainee to demonstrate [**10] no reasonably foreseeable, significant likelihood of removal or show that his detention is indefinite; it is something less than that." _Senor v. Barr, 401 F. Supp. 3d 420, 430 (W.D.N.Y. 2019)_ (citations, quotations, and alterations omitted), appeal withdrawn, _No. 19-3333, 2020 U.S. App. LEXIS 11985, 2020 WL 1862195 (2d Cir. Feb. 6, 2020)_.

Here, Petitioner has now been subjected to almost 16 months of detention since his removal period began. Accordingly, [*266] a determination of the "reasonably foreseeable future" is decidedly limited at this time. _See Aung v. Barr, No. 20-CV-681-LJV, 2020 U.S. Dist. LEXIS 142650, 2020 WL 4581465, at *3 (W.D.N.Y. Aug. 10, 2020)_ (holding that because petitioner was "subjected to more than thirteen months of post-removal-order detention—more than twice the presumptively reasonable period," that "[w]hat counts as the 'reasonably foreseeable future' therefore is quite narrow." (quotation and citation omitted)).

Further, not only has there been a substantial passage of time, there does not appear to be any information before the Court at this time demonstrating that ICE has made progress in repatriating Petitioner. _Cf. Lorenzo v. Barr, No. 20-CV-1372 (JLS), 2021 U.S. Dist. LEXIS 4958, 2021 WL 84283, at *6 (W.D.N.Y. Jan. 11, 2021)_ ("The mere passage of time beyond the six-month presumptively reasonable period does not satisfy his burden under _Zadvydas_."). The reasons for the lack of any such progress are unexplained, particularly since Respondent asserts, "There are no institutional barriers to Petitioner's removal, as [**11] evidenced by ICE's removal of hundreds of noncitizens to Pakistan in the recent past." (Dkt. 4-3 at 4 (noting that ICE removed 122, 244, and 241 noncitizens to Pakistan in 2021, 2020, and 2019, respectively)). Indeed, despite Respondent's argument to the contrary, the fact that ICE has routinely removed noncitizens to Pakistan underscores that there may be good reason to believe that there is not a significant likelihood that Petitioner will be removed in the reasonably foreseeable future. Respondent acknowledges that the Pakistani Consulate "has the documents necessary to issue a travel document for Petitioner's removal." (_Id._ at 5). Petitioner alleges in his complaint that the "deportation officer,"

presumably an ICE officer, told him that the Pakistani Consulate normally issues travel documents within one month of an interview and that he was interviewed one year ago, on August 11, 2023. (Dkt. 1 at ¶ 24). Respondent has not disputed these allegations. While Respondent states that ICE has been following up with the Consulate since April 2023, the Court is left with no estimation as to when removal may be effectuated. _See Cyclewala v. Searls, No. 6:21-CV-06372 EAW, 2021 U.S. Dist. LEXIS 240551, 2021 WL 5989781, at *5 (W.D.N.Y. Dec. 16, 2021)_ (finding ICE's failure to explain the lack of progress in [**12] effectuating petitioner's removal, especially when respondent conceded that India had "a good prior record of accepting removed aliens[,]" left the Court unable to estimate when removal would occur); _Singh, 362 F. Supp. 3d at 102_ ("And if DHS has no idea of when it might reasonably expect Singh to be repatriated, this Court certainly cannot conclude that his removal is likely to occur—or even that it _might_ occur—in the reasonably foreseeable future. So this Court is left to guess whether his deportation might occur in ten days, ten months, or ten years.").

Petitioner submitted a supplemental declaration indicating that he has spoken to Pakistani officials four times since March 2024 and that these officials could not say how long the repatriation process would take, nor could his "deportation officer." (Dkt. 8-1 at ¶¶ 2-3). Neither Pakistani nor DHS officials have asked Petitioner to provide additional information to facilitate issuance of his travel documents, according to Petitioner. (_Id._). Petitioner also submitted a copy of a Decision to Continue Detention, which ICE issued to him on April 15, 2024. (Dkt. 8-2). The decision states that ICE is working to secure a travel document for Petitioner, that the document [**13] is "expected," and that "ICE has reason to believe there's a significant likelihood that your removal will occur in the reasonably foreseeable future[.]." (_Id._). No additional details or justification were offered.

[*267] In sum, based on the foregoing, Petitioner has satisfied his initial burden of showing that there is good reason to believe there is no significant likelihood of removal in the reasonably foreseeable future.

### IV. Respondent will be Permitted to Supplement his Submission

The Court finds that, at this time, Respondent has failed to rebut Petitioner's showing. Respondent argues that

 LexisNexis

**Date and Time:** Thursday, September 18, 2025 11:15 AM EDT
**Job Number:** 263109960

## Document (1)

1. _Salad v. Dep't of Corr., 769 F. Supp. 3d 913_
   **Client/Matter:** -None-
   **Search Terms:** reasonably foreseeable future
   **Search Type:** Natural Language
   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | Sources: All Immigration |

LexisNexis | About LexisNexis | Privacy Policy | Terms & Conditions | Copyright © 2025 LexisNexis

769 F. Supp. 3d 913, *916; 2025 U.S. Dist. LEXIS 41117, **2

continued detention pursuant to _8 U.S.C. § 1231(a)(6)_ violates federal law. After _de novo_ review of the objections, and for the reasons discussed below, the Court **ACCEPTS and ADOPTS** the Final R&R at Docket 33 with modification. Accordingly, the Petition at Docket 1 is **GRANTED**.

## II. BACKGROUND

_A. Immigration Proceedings_

This Court adopts and incorporates the Magistrate Judge's statement of facts set forth in the "Background" portion of the Final R&R and as summarized below.[5]

Salad is a citizen of Somalia and entered the country without inspection on December [*917] 8, 2022.[6] He applied for asylum after he was apprehended by Border Patrol shortly after crossing into [**3] the United States.[7] Salad was then placed into removal proceedings, but he claimed fear of return.[8] A credible fear interview was conducted while he was in Immigration and Customs Enforcement ("ICE") custody and a hearing was conducted.[9] An Immigration Judge found Salad's claim of fear not credible, denied his application for asylum, and ordered him removed to Somalia.[10] Salad reserved appeal of the Immigration Judge's decision, but the Board of Immigration Appeals dismissed Salad's appeal and the removal order became final.[11] ICE began trying to obtain a travel document necessary to remove Salad to Somalia.[12]

Nearly one year after his detention began, on November 29, 2023, ICE released Salad after it determined that there was not a significant likelihood of removal in the **_reasonably foreseeable future_** because it could not

obtain a travel document from Somalia.[13] Under the terms of his release outlined in his order of supervision ("OSUP"), Salad was required to report any change of address to the San Antonio Enforcement and Removal Operations ("ERO") office.[14] A local ERO officer asserted that Salad failed to report back to the San Antonio ERO office on December 18, 2024, as required [**4] and Salad became an "immigration fugitive."[15] However, Salad testified that he did report to the ERO office on that day and informed ERO that he was living in Alaska.[16]

On January 15, 2025, Salad filed an Application for Temporary Protected Status ("TPS") with the United States Citizenship and Immigration Services.[17] Then, on February 5, 2025, the Alaska ERO office learned that Salad's case was under review by Somalia to issue a travel document for Salad.[18] A warrant for Salad's arrest was subsequently issued by the Department of Homeland Security (DHS).[19] At that time, Salad was living in Alaska and working as a caregiver for elderly people.[20] Salad provided his Anchorage address on his TPS application.[21]

On February 5, 2025, Salad was arrested by officers from ICE, Anchorage ERO, and agents from ICE's Homeland Security Investigations ("HSI") and FBI Anchorage.[22] Salad was taken into ICE custody and transported to the Anchorage jail.[23] On February 8, 2025, an ERO officer served Salad with a Notice of Revocation of Release ("Notice") and informed him he

---

[5] Dkt. 33 at 2-6.

[6] Dkt. 13 (Declaration of Officer Bradley Hayes) at 1.

[7] _Id._

[8] _Id._ at 2

[9] _Id._

[10] _Id._

[11] _Id._

[12] _Id._

---

[13] _Id._

[14] _Id._ at 3.

[15] _Id._

[16] Dkt. 30 (Transcript of Proceedings on February 19, 2025) at 8, 15.

[17] Dkt. 13 at 3.

[18] _Id._

[19] _Id._

[20] Dkt. 30 at 6.

[21] Dkt. 13 at 3.

[22] _Id._

[23] _Id._ at 3-4.

769 F. Supp. 3d 913, *919; 2025 U.S. Dist. LEXIS 41117, **6

in the *future*.[40] The Magistrate Judge also found the Federal Respondents' argument that removal was foreseeable because Salad's TPS application would end with one of two outcomes—denial of the TPS application followed by Salad's removal, or a grant of his application followed by his [**7] release—unpersuasive.[41] Therefore, the Magistrate Judge recommends issuance of a writ ordering Salad's immediate release from custody.[42]

The Federal Respondents object to the Magistrate Judge's Final R&R on two grounds: (1) that the Magistrate Judge incorrectly interpreted the standard in *Zadvydas*, and (2) that the Magistrate Judge failed to give weight to the impact of the temporary travel document on removability.[43] The Federal Respondents argue that: "*Zadvydas* does not state that just because something in the *future* may interfere with INS's plans, there is no [significant likelihood of removal in the *reasonably foreseeable future*]."[44] They assert that a decision on his TPS application would be a "definite end" to his detention.[45] They also argue that "continued detention is reasonably necessary to secure removal with a cooperating country."[46]

Salad responds that there is no significant likelihood that he will be removed in the *reasonably foreseeable future* because it is "virtually certain that he will not be removable through the end of the most recent TPS designation."[47] He further argues that the Federal Respondents still fail to rebut his showing.[48] Salad maintains [**8] that whether he will become deportable again is speculative because (1) the travel document will expire before the TPS determination will become final and (2) the Federal Respondents provided no

evidence that the travel document will be renewed.[49]

## III. LEGAL STANDARD

### A. The District Court's Review of the Magistrate Judge's Report and Recommendation

The matter is now before this Court pursuant to *28 U.S.C. § 636(b)(1)*, which [*920] provides that a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge" and shall review objections de novo.[50]

### B. Detention of a Noncitizen During Immigration Proceedings

The Immigration and Nationality Act ("INA") permits detention of noncitizens present in the United States during immigration proceedings.[51] Pursuant to *8 U.S.C. § 1231*, a noncitizen who is ordered removed shall be removed by DHS within 90 days.[52] During the removal period, the noncitizen must be detained.[53] If the Government fails to remove the noncitizen during those 90 days, the statute only authorizes further detention if the noncitizen is: (1) "inadmissible" under certain grounds, (2) "removable" as a result of violations of status requirements or entry conditions, [**9] violations of criminal law, or reasons of security or foreign policy, (3) or has been "determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal."[54]

In *Zadvydas v. Davis*, the Supreme Court addressed whether there was a limit to the time a noncitizen can be detained after the initial 90-day removal period

---

[40] *Id.* at 12-13.

[41] *Id.* at 14.

[42] *Id.* at 15.

[43] Dkt. 37 (Federal Respondents' Objection) at 2-3.

[44] *Id.* at 2.

[45] *Id.* at 3.

[46] *Id.*

[47] Dkt. 38 (Petitioner's Response) at 1.

[48] *Id.* at 5.

[49] *Id.* at 5.

[50] *28 U.S.C. § 636(b)(1)*.

[51] *8 U.S.C. §§ 1225(b)*, *1226(a)*, 1226(c), 1231(a).

[52] *8 U.S.C. § 1231(a)(1)(A)*.

[53] *8 U.S.C. § 1231(a)(2)*.

[54] *8 U.S.C. § 1231(a)(6)*; *Zadvydas v. Davis, 533 U.S. 678, 682, 121 S. Ct. 2491, 150 L. Ed. 2d 653 (2001)*.

Case 6:25-cv-06502-MAV    Document 2-1    Filed 09/29/25    Page 95 of 101

Page 6 of 8

769 F. Supp. 3d 913, *921; 2025 U.S. Dist. LEXIS 41117, **11

prudential rather than jurisdictional requirement.[72] Courts may require prudential exhaustion if "(1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review."[73] Even if these factors weigh in favor of prudential exhaustion, the court may waive the exhaustion requirement if "administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void."[74]

First, the Court determines that an administrative appellate [**12] record is not necessary to resolve the legal question of whether there is a significant likelihood of removal in the *reasonably foreseeable future*. Second, the Court does not believe [*922] that waiver of prudential exhaustion would encourage the deliberate bypass of the administrative scheme because this issue appears to arise rarely and, once the question is addressed, it may cease to arise. Third, administrative review would not preclude the need for judicial review, because litigants would undoubtedly seek this Court's determination of whether the standard applied by the agency was correct. Even if these factors weighed against prudential exhaustion, the Court finds that the continued unlawful detention of Salad would cause irreparable injury. Therefore, even if Salad has not exhausted administrative remedies, the Court determines that waiver of prudential exhaustion is appropriate.

### B. Continued Detention of Salad is Unlawful Because There is No Significant Likelihood of Removal in the *Reasonably Foreseeable Future*

The Court accepts and adopts the Magistrate Judge's determination that Salad has provided good reason to believe that there is no significant likelihood of removal in the *reasonably* [**13] *foreseeable future* and that

the Federal Respondents have failed to rebut this showing.[75]

### 1. Salad's Continued Detention is Unlawful Under *Zadvydas*

The Federal Respondents challenge the Magistrate Judge's interpretation of *Zadvydas* and argue that Salad's continued detention is permissible under its holding.[76] They assert that *Zadvydas* should not be applied to mean "that just because something in the *future may* interfere with INS's plans, there is no [significant likelihood of removal in the *reasonably foreseeable future*]."[77] However, that is not how the Magistrate Judge, or this Court, interprets *Zadvydas*. Rather, the "INS's plans," as the Federal Respondents describe Salad's deportation, depend on the occurrence of multiple unguaranteed *future* events—principally, the denial of Salad's TPS application and the issuance of a new travel document—and the Federal Respondents have failed to submit sufficient evidence that any of these events are significantly likely to happen.

The parties do not contest that Salad's detention has exceeded the *reasonably foreseeable* six-month period established in *Zadvydas*.[78] Salad has shown that he has applied for TPS and is *prima facie* eligible.[79] The parties also do not contest that Salad cannot [**14] be removed while his application is pending.[80] This position is reflected in statute: the INA prohibits removal of an individual who is *prima facie* eligible for TPS.[81] Although the ultimate decision whether to approve or deny his application rests with the United States Customs and Immigration Services (USCIS), Salad's *prima facie* eligibility supports an inference that he is highly likely to obtain TPS because USCIS makes the decision to grant

---

[72] *Id.*

[73] *Puga v. Chertoff, 488 F.3d 812, 815 (9th Cir. 2007).*

[74] *Hernandez v. Sessions, 872 F.3d 976, 897 (9th Cir. 2017)* (quoting *Laing v. Ashcroft, 370 F.3d 994, 1000 (9th Cir. 2004)).*

[75] Dkt. 33 at 10-15.

[76] Dkt. 37 at 2-3.

[77] *Id.* at 2.

[78] Dkt. 12 at 11-12; Dkt. 30 at 21

[79] Dkt. 35 at 7-8, 21-22; Dkt. 19-3 (TPS Application).

[80] Dkt. 35 at 19.

[81] *8 U.S.C. § 1254a(a)(1)(A)* (prohibiting removal of individuals granted TPS); *8 U.S.C. § 1254a(a)(4)(B)* ("In the case of an alien who establishes a *prima facie* case of eligibility for benefits under paragraph (1), until a final determination with respect to the alien's eligibility for such benefits under paragraph (1) has been made, the alien shall be provided such benefits.").

769 F. Supp. 3d 913, *924; 2025 U.S. Dist. LEXIS 41117, **17

November 28, 2023, OSUP.[93] If immigration authorities deem these conditions insufficient, they shall modify the conditions through appropriate administrative process after Salad's release from detention.[94] "

THEREFORE, the Court **GRANTS** the Petition at Docket 1 and finding the Petitioner is entitled to immediate release from custody, a Writ shall issue. Salad shall file **on or before 12:30 PM, on March 7, 2025,** a proposed writ of habeas corpus in word format with the Court [**18] at burgessproposedorders@akd.uscourts.gov.

IT IS SO ORDERED.

Dated at Anchorage, Alaska, this 7th day of March, 2025.

*/s/ Timothy M. Burgess*

TIMOTHY M. BURGESS

UNITED STATES DISTRICT JUDGE

---

**End of Document**

---

[93] Dkt. 19-1 (OSUP).

[94] *8 C.F.R. § 241.13(h)(1)*.

# ATTACHMENT  "F"

# SOCIAL SECURITY STATEMENT

# Your Social Security Statement

RAMIRO LOACHAMIN

March 17, 2025

## Retirement Benefits

You have earned enough credits to qualify for retirement benefits. To qualify for benefits, you earn credits through your work - up to four each year.

Your full retirement age is **67**, based on your date of birth: May 8, 1972. As shown in the chart, you can start your benefits at any time between **ages 62** and **70. For each month you wait to start your benefits, your monthly benefit will be higher—for the rest of your life.**

These personalized estimates are based on your earnings to date and assume you continue to earn $51,799 per year until you start your benefits. Learn more at *ssa.gov/benefits/retirement/learn.html* .

## Personalized Monthly Retirement Benefit Estimates (Depending on the Age You Start)



| Age Retirement Benefits Start | Monthly Benefit Amount |
|---|---|
| 62 | $1,192 |
| 63 | $1,294 |
| 64 | $1,406 |
| 65 | $1,551 |
| 66 | $1,700 |
| 67 | $1,851 |
| 68 | $1,980 |
| 69 | $2,160 |
| 70 | $2,394 |

## Disability Benefits

You have earned enough credits to qualify for disability benefits. If you became disabled right now and you have enough recent work, your monthly payment would be about **$1,554.** Learn more at *ssa.gov/disability*.

## Survivors Benefits

You have earned enough credits for your eligible family members to receive survivors benefits. If you die this year, members of your family who may qualify for monthly benefits include:

| | |
|---|---|
| Minor child: | **$1,199** |
| Spouse, if caring for a disabled child or child younger than age 16: | **$1,199** |
| Spouse, if benefits start at full retirement age: | **$1,598** |
| Total family benefits cannot be more than: | **$2,436** |

Your spouse or minor child may be eligible for an additional one-time death benefit of **$255.** Learn more at *ssa.gov/survivors*.

## Medicare

You have enough credits to qualify for Medicare at age 65.

Medicare is the federal health insurance program for people:

- age 65 and older,
- under 65 with certain disabilities, and
- of any age with End-Stage Renal Disease (ESRD) (permanent kidney failure requiring dialysis or a kidney transplant).

Even if you do not retire at age 65, you may need to sign up for Medicare within 3 months of your 65th birthday to **avoid a lifetime late enrollment penalty.** Special rules may apply if you are covered by certain group health plans through work.

For more information about Medicare, visit *medicare.gov* or *ssa.gov/medicare* or call **1-800-MEDICARE (1-800-633-4227) (TTY 1-877-486-2048).**

We base benefit estimates on current law, which Congress has revised before and may revise again to address needed changes. Learn more about Social Security's future at *ssa.gov/ThereForMe.*

**Earnings Record**
Review your earnings history below to ensure it is accurate because we base your future benefits on our record of your earnings. There's a limit to the amount of earnings you pay Social Security taxes on each year. Earnings above the limit do not appear on your earnings record. We have combined your earlier years of earnings below, but you can view your complete earnings record online with *my* Social Security. **If you find an error,** view your full earnings record online and call **1-800-772-1213.**

| Work Year | Earnings Taxed for Social Security | Earnings Taxed for Medicare (began 1966) |
|---|---|---|
| 1981-1990 | $1,120 | $1,120 |
| 1991-2000 | $112,489 | $112,489 |
| 2001-2005 | $64,992 | $64,992 |
| 2006 | $14,740 | $14,740 |
| 2007 | $0 | $0 |
| 2008 | $810 | $810 |
| 2009 | $10,984 | $10,984 |
| 2010 | $1,594 | $1,594 |
| 2011 | $5,753 | $5,753 |
| 2012 | $4,499 | $4,499 |
| 2013 | $6,099 | $6,099 |
| 2014 | $9,414 | $9,414 |
| 2015 | $9,696 | $9,696 |
| 2016 | $13,963 | $13,963 |
| 2017 | $20,282 | $20,282 |
| 2018 | $37,337 | $37,337 |
| 2019 | $39,538 | $39,538 |
| 2020 | $280 | $280 |
| 2021 | $42,642 | $42,642 |
| 2022 | $53,859 | $53,859 |
| 2023 | $51,799 | $51,799 |
| 2024 | Not yet recorded | Not yet recorded |

**Taxes Paid**
Total estimated Social Security and Medicare taxes paid over your working career based on your Earnings Record:

**Social Security taxes**
You paid: $34,058
Employer(s): $27,940

**Medicare taxes**
You paid: $8,003
Employer(s): $6,527

**Earnings Not Covered by Social Security**
You may also have earnings from work not covered by Social Security, where you did not pay Social Security taxes. This work might have been for federal, state, or local government or in a foreign country. If you participate in a retirement plan or receive a pension based on work for which you did not pay Social Security tax, it could lower your benefits. Learn more at *ssa.gov/gpo-wep* .

**Important Things to Know about Your Social Security Benefits**
- Social Security benefits are not intended to be your only source of retirement income. You may need other savings, investments, pensions, or retirement accounts to make sure you have enough money when you retire.
- You need at least 10 years of work (40 credits) to qualify for retirement benefits. The amount of your benefit is based on your highest 35 years of earnings. If you have fewer than 35 years of earnings, years without work count as 0 and may reduce your benefit amount.
- To keep up with inflation, benefits are adjusted through "cost of living adjustments."
- If you get retirement or disability benefits, your spouse and children may qualify for benefits.
- When you apply for either retirement or spousal benefits, you may be required to apply for both benefits at the same time.
- The age you claim benefits will affect your surviving spouse's benefit amount. For example, claiming benefits after your full retirement age may increase the *Spouse, if benefits start at full retirement age* amount on page 1; claiming early may reduce it.
- If you and your spouse both work, use the *my* Social Security Retirement Calculator to estimate spousal benefits.
- If you are divorced and were married for 10 years, you may be able to claim benefits on your ex-spouse's record. If your ex-spouse receives benefits on your record, that does not affect your or your current spouse's benefit amounts.
- Learn more about benefits for you and your family at *ssa.gov/benefits/retirement/planner/applying7.html* .
- When you are ready to apply, visit *ssa.gov/benefits/retirement/apply.html* .
- The *Statement* is updated annually. It is available online, or by mail upon request.

RJS 44   (Rev. 12/07)                         CIVIL COVER SHEET                    25 CV 6502

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided
by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating
the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Ramiro Loachamin

**DEFENDANTS**
Director of Buffalo Field off. Steven Kurzdorfer ,Joseph Freden in his official capacity as Officer-in-Charge of the B.F.D.F

**(b)** County of Residence of First Listed Plaintiff   Genesee County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Genesee County
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Pro Se

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1  U.S. Government
     Plaintiff

☒ 3  Federal Question
     (U.S. Government Not a Party)

☐ 2  U.S. Government
     Defendant

☐ 4  Diversity
     (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES(Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                    and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☒ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☒ 1  Original
     Proceeding

☐ 2  Removed from
     State Court

☐ 3  Remanded from
     Appellate Court

☐ 4  Reinstated or
     Reopened

☐ 5  Transferred from
     another district
     (specify)

☐ 6  Multidistrict
     Litigation

☐ 7  Appeal to District
     Judge from
     Magistrate
     Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. § 2241
Brief description of cause:
Ongoing detention violates due process

## VII. REQUESTED IN
## COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

## VIII. RELATED CASE(S)
## IF ANY
(See instructions):        JUDGE _____        DOCKET NUMBER _____

DATE   09/19/2025

SIGNATURE OF ATTORNEY OF RECORD   Rami Loachamin   Pro Se

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

| Print | Save As... | Export as PDF | Retrieve PDF File | Reset |

Ramiro Loachamin
A#036-438-940
B.F.D.F.
4250 Federal dr
Batavia, NY 14020

ground



$5.04 0
US POSTAGE IMI
FIRST-CLASS
0635S0001436937
FROM 14020

$5.04 0
US POSTAGE IMI
FIRST-CLASS
0635S0001436937
FROM 14020

Buffalo Federal Detention Facility

Clerk of the Court
U.S. District Court for the W.D. N.Y.
United State District
100 State St.
Rochester, NY 14614

USDC/WDNY
SEP 23 2025
ROCHESTER